## COUCH v. UNITED STATES ET AL.

No. 71–889.  Argued November 14, 1972—Decided January 9, 1973

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, BLACKMUN, and REHNQUIST, JJ., joined. BRENNAN, J., filed a concurring opinion, *post*, p. 337. DOUGLAS, J., *post*, p. 338, and MARSHALL, J., *post*, p. 344, filed dissenting opinions.

*John G. Rocovich, Jr.,* argued the cause for petitioner. With him on the briefs was *Claude D. Carter.*

*Lawrence G. Wallace* argued the cause for the United States et al.   On the brief were *Solicitor General Griswold, Assistant Attorney General Crampton, Keith A. Jones, John P. Burke,* and *John M. Brant.*

MR. JUSTICE POWELL delivered the opinion of the Court.

On January 7, 1970, the Government filed a petition in the United States District Court for the Western District of Virginia, pursuant to 26 U. S. C. §§ 7402 (b) and 7604 (a),[1] seeking enforcement of an Internal Revenue summons in connection with an investigation of petitioner's tax liability from 1964–1968. The summons was directed to petitioner's accountant for the production of:

> "All books, records, bank statements, cancelled checks, deposit ticket copies, workpapers and all other pertinent documents pertaining to the tax liability of the above taxpayer." [2]

The question is whether the taxpayer may invoke her Fifth Amendment privilege against compulsory self-incrimination to prevent the production of her business and tax records in the possession of her accountant.

---

[1] SEC. 7402. JURISDICTION OF DISTRICT COURTS.

. . . . .

"(b) *To enforce summons.* If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, or other data, the district court of the United States for the district in which such person resides or may be found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, or other data."

SEC. 7604. ENFORCEMENT OF SUMMONS.

"(a) *Jurisdiction of district court.* If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, records, or other data, the United States district court for the district in which such person resides or is found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, records, or other data."

[2] App. 59–60.

Both the District Court[3] and the Court of Appeals for the Fourth Circuit[4] held the privilege unavailable. We granted certiorari, 405 U. S. 1038.

Petitioner is the sole proprietress of a restaurant. Since 1955 she had given bank statements, payroll records, and reports of sales and expenditures to her accountant, Harold Shaffer, for the purpose of preparing her income tax returns. The accountant was not petitioner's personal employee but an independent contractor with his own office and numerous other clients who compensated him on a piecework basis. When petitioner surrendered possession of the records to Shaffer, she, of course, retained title in herself.

During the summer of 1969, Internal Revenue Agent Dennis Groves commenced an investigation of petitioner's tax returns. After examining her books and records in Shaffer's office with his permission, Groves found indications of a substantial understatement of gross income. Groves thereupon reported the case to the Intelligence Division of the Internal Revenue Service.

Special Agent Jennings of the Intelligence Division next commenced a joint investigation with Groves to determine petitioner's correct tax liability, the possibility of income tax fraud and the imposition of tax fraud penalties, and, lastly, the possibility of a recommendation of a criminal tax violation. Jennings first introduced himself to petitioner, gave her *Miranda* warnings

---

[3] The District Court held that "[s]ince, at the time the summons was served, the taxpayer, Lillian V. Couch, was not in possession of the books, records and documents described in the summons, she may not assert any Fifth Amendment privilege against self-incrimination as a bar to the enforcement of the summons." App. 6, 11. The opinion of the District Court (WD Va.) is not reported.

[4] The Court of Appeals also noted that the answer to petitioner's Fifth Amendment contentions lay in the fact that "the records were not in the intervenor's [taxpayer's] possession but were in the custody of her accountant," 449 F. 2d 141, 143 (1971).

as required by IRS directive, and then issued the summons to Shaffer[5] after the latter refused to let him see, remove, or microfilm petitioner's records.

When Jennings arrived at Shaffer's office on September 2, 1969, the return day of the summons, to view the records, he found that Shaffer, at petitioner's request, had delivered the documents to petitioner's attorney. Jennings thereupon petitioned the District Court for enforcement of the summons, and petitioner intervened, asserting that the ownership of the records warranted a Fifth Amendment privilege to bar their production.[6]

---

[5] The summons, which is printed in full in App. 59–60, was issued on August 18, 1969, pursuant to 26 U. S. C. § 7602, which provides:

EXAMINATION OF BOOKS AND WITNESSES.

"For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized—

"(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

"(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

"(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry."

[6] Petitioner also claimed that enforcement of the summons would violate her Fourth Amendment right to be secure from unreasonable searches and seizures. We agree with the Government, however, that "this claim is not further articulated and does not appear to

## I

It is now undisputed that a special agent is authorized, pursuant to 26 U. S. C. § 7602, to issue an Internal Revenue summons in aid of a tax investigation with civil and possible criminal consequences.[7]  In *Donaldson* v. *United States,* 400 U. S. 517 (1971), the Court upheld such a summons, noting that:

> "Congress clearly has authorized the use of the summons in investigating what may prove to be criminal conduct. . . .  There is no statutory suggestion for any meaningful line of distinction, for civil as compared with criminal purposes, at the point of a special agent's appearance. . . .  To draw a line where a special agent appears would require the Service, in a situation of suspected but undetermined fraud, to forgo either the use of the summons or the potentiality of an ultimate recommendation for prosecution.  We refuse to draw that line and thus to stultify enforcement of federal law."  *Id.,* at 535–536.[8]

The Court in *Donaldson* noted that the taxpayer there had attempted to intervene, pursuant to Fed. Rule Civ. Proc. 24 (a)(2), to bar production of records "in which the taxpayer has no proprietary interest of any kind, which are owned by the third person, which are in his

---

be independent of her Fifth Amendment argument."  Brief for United States 21–22.  See part IV, *infra.*

[7] There is clearly the joint civil and possibly criminal investigatory purpose in the instant case, see *supra,* at 324.

[8] *Donaldson* cautioned only that the summons be issued in good faith and prior to a recommendation for criminal prosecution.  400 U. S., at 536.  Neither of those conditions is successfully challenged here.

hands, and which relate to the third person's business transactions with the taxpayer." *Id.*, at 523. The Court quite properly concluded that, under those facts, no absolute right to intervene existed. *Id.*, at 530–531. The instant case, however, presents a different question. Here petitioner does own the business records which the Government seeks to review and the courts below did permit her to intervene. The essential inquiry is whether her proprietary interest further enables her to assert successfully a privilege against compulsory self-incrimination to bar enforcement of the summons and production of the records, despite the fact that the records no longer remained in her possession.

## II

The importance of preserving inviolate the privilege against compulsory self-incrimination has often been stated by this Court and need not be elaborated. *Counselman* v. *Hitchcock,* 142 U. S. 547 (1892); *Malloy* v. *Hogan,* 378 U. S. 1 (1964); *Miranda* v. *Arizona,* 384 U. S. 436 (1966). By its very nature, the privilege is an intimate and personal one. It respects a private inner sanctum of individual feeling and thought and proscribes state intrusion to extract self-condemnation. Historically, the privilege sprang from an abhorrence of governmental assault against the single individual accused of crime and the temptation on the part of the State to resort to the expedient of compelling incriminating evidence from one's own mouth. *United States* v. *White,* 322 U. S. 694, 698 (1944). The Court has thought the privilege necessary to prevent any "recurrence of the Inquisition and the Star Chamber, even if not in their stark brutality," *Ullmann* v. *United States,* 350 U. S. 422, 428 (1956).

In *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 55 (1964), the Court articulated the policies and purposes of the privilege:

> "[O]ur unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates 'a fair state-individual balance by requiring the government . . . in its contest with the individual to shoulder the entire load,' . . . our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life' . . . ."

It is important to reiterate that the Fifth Amendment privilege is a *personal* privilege: it adheres basically to the person, not to information that may incriminate him. As Mr. Justice Holmes put it: "A party is privileged from producing the evidence but not from its production." *Johnson* v. *United States,* 228 U. S. 457, 458 (1913). The Constitution explicitly prohibits compelling an accused to bear witness "against himself"; it necessarily does not proscribe incriminating statements elicited from another. Compulsion upon the person asserting it is an important element of the privilege, and "prohibition of compelling a man . . . to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from *him,*" *Holt* v. *United States,* 218 U. S. 245, 252–253 (1910) (emphasis added). It is extortion of information from the accused himself that offends our sense of justice.

In the case before us the ingredient of personal compulsion against an accused is lacking. The summons and the order of the District Court enforcing it are directed against the accountant.[9] He, not the taxpayer, is the only one compelled to do anything. And the accountant makes no claim that he may tend to be incriminated by the production. Inquisitorial pressure or coercion against a potentially accused person, compelling her, against her will, to utter self-condemning words or produce incriminating documents is absent. In the present case, no "shadow of testimonial compulsion upon or enforced communication by the accused" is involved. *Schmerber* v. *California,* 384 U. S. 757, 765 (1966).

The divulgence of potentially incriminating evidence against petitioner is naturally unwelcome. But petitioner's distress would be no less if the divulgence came not from her accountant but from some other third party with whom she was connected and who possessed substantially equivalent knowledge of her business affairs. The basic complaint of petitioner stems from the fact of divulgence of the possibly incriminating information, not from the manner in which or the person from whom it was extracted. Yet such divulgence, where it does not result from coercion of the suspect herself, is a necessary part of the process of law enforcement and tax investigation.

---

[9] Technically the order to produce the records was directed to petitioner's attorney since, after the summons was served upon the accountant, he ignored it and surrendered the records to the attorney. But constitutional rights obviously cannot be enlarged by this kind of action. The rights and obligations of the parties became fixed when the summons was served, and the transfer did not alter them. See *United States* v. *Zakutansky,* 401 F. 2d 68, 72 (CA7 1968), cert. denied, 393 U. S. 1021 (1969); *United States* v. *Lyons,* 442 F. 2d 1144 (CA1 1971).

## III

Petitioner's reliance on *Boyd* v. *United States,* 116 U. S. 616 (1886), is misplaced. In *Boyd,* the person asserting the privilege was in possession of the written statements in question. The Court in *Boyd* did hold that "any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime," violated the Fourth and Fifth Amendments. *Id.,* at 630. That case did not, however, address or contemplate the divergence of ownership and possession,[10] and petitioner concedes that court decisions applying *Boyd* have largely been in instances where possession and ownership conjoined,[11] see, *e. g., Hill* v. *Philpott,* 445 F. 2d 144 (CA7 1971); *United States* v. *Judson,* 322 F. 2d 460, 63–2 USTC ¶ 9658 (CA9 1963).[12] In *Boyd,* the production order was directed against the owner of the property who, by responding, would have been forced "to produce and authenticate any personal documents or effects that might incriminate him." *United States* v. *White,* 322

---

[10] A later Court commenting on the *Boyd* privilege noted that "the papers and effects which the privilege protects must be the private property of the person claiming the privilege, or *at least in his possession in a purely personal capacity." United States* v. *White,* 322 U. S. 694, 699 (1944). (Emphasis added.)

[11] Brief for Petitioner 13–14.

[12] See also *United States* v. *Cohen,* 388 F. 2d 464, 468 (CA9 1967), where the court, in upholding the right of a possessor, nonowner, to assert the privilege, noted that "it is possession of papers sought by the government, not ownership, which sets the stage for exercise of the governmental compulsion which it is the purpose of the privilege to prohibit." Though the instant case concerns the scope of the privilege for an owner, nonpossessor, the Ninth Circuit's linkage of possession to the purposes served by the privilege was appropriate.

We do not, of course, decide what qualifies as rightful possession enabling the possessor to assert the privilege.

U. S., at 698.  But we reiterate that in the instant case there was no enforced communication of any kind from any accused or potential accused.

Petitioner would, in effect, have us read *Boyd* to mark ownership, not possession, as the bounds of the privilege,[13] despite the fact that possession bears the closest relationship to the personal compulsion forbidden by the Fifth Amendment.  To tie the privilege against self-incrimination to a concept of ownership would be to draw a meaningless line.  It would hold here that the business records which petitioner actually owned would be protected in the hands of her accountant, while business information communicated to her accountant by letter and conversations in which the accountant took notes, in addition to the accountant's own workpapers and photocopies of petitioner's records, would not be subject to a claim of privilege since title rested in the accountant.  Such a holding would thus place unnecessary emphasis on the form of communication to an accountant and the accountant's own working methods, while diverting the inquiry from the basic purposes of the Fifth Amendment's protections.

Other precedents debated by the parties lend no support to petitioner's contention that ownership of documents should determine the availability of the privilege.[14]

---

[13] Brief for Petitioner 11–17.

[14] *Burdeau* v. *McDowell,* 256 U. S. 465 (1921), also debated and cited in the briefs, held that the Government may retain for use against their owner in a criminal proceeding incriminating documents which were stolen by private individuals, without any governmental knowledge or complicity, and turned over to the Government.  The Court, in denying the owner's privilege, alluded primarily to the absence of any governmental compulsion against the accused, the precise factor considered in the instant case.  It is true, as petitioner argues, that the case turns somewhat on a discussion of governmental versus private compulsion and invasion, but it is

In *Perlman* v. *United States*, 247 U. S. 7 (1918), the Court held the privilege unavailable to a party seeking to suppress the admission of incriminating documents and exhibits before a grand jury. The movant's expectations of privacy in the exhibits had, according to the Court, been destroyed when he voluntarily surrendered the exhibits as evidence in a patent infringement case he had earlier brought in Federal District Court. Petitioner's claims of ownership failed to overcome this fact. The Court noted pertinently:

> "But Perlman insists that he owned the exhibits and appears to contend that his ownership exempted them from any use by the Government without his consent. The extent of the insistence is rather elusive of measurement. It seems to be that the owner of property must be considered as having a constructive possession of it wherever it

equally true that the Court in *Burdeau* failed to find any impermissible public compulsion on the owner absent his possession:

"We know of no constitutional principle which requires the Government to surrender the papers under such circumstances. Had it learned that such incriminatory papers, tending to show a violation of federal law, were in the hands of a person other than the accused, it having had no part in wrongfully obtaining them, we know of no reason why a subpoena might not issue for the production of the papers as evidence. Such production would require no unreasonable search or seizure, nor would it amount to compelling the accused to testify against himself." *Id.*, at 476.

In *Johnson* v. *United States*, 228 U. S. 457 (1913), the Court held that the books and records of a bankrupt transferred to a trustee in bankruptcy could be used as evidence against the bankrupt in a prosecution for concealing money from the trustee. Unlike the instant case, both title and possession passed in that transfer and the records were, in one sense, "published" by it. But the Court, in denying the privilege, recognized that the transfer also succeeded in removing the important element of personal compulsion against the accused, *id.*, at 459, just as, in this case, the nature of the divestment of possession did.

be and in whosesoever hands it be, and it is always, therefore, in a kind of asylum of constitutional privilege. And to be of avail the contention must be pushed to this extreme. It is opposed, however, by all the cited cases. They, as we have said, make the criterion of immunity not the ownership of property but the 'physical or moral compulsion' exerted." *Id.,* at 15.

Petitioner argues, nevertheless, that grave prejudice will result from a denial of her claim to equate ownership and the scope of the privilege. She alleges that "[i]f the IRS is able to reach her records the instant those records leave her hands and are deposited in the hands of her retainer whom she has hired for a special purpose then the meaning of the privilege is lost." [15] That is not, however, the import of today's decision. We do indeed believe that actual possession of documents bears the most significant relationship to Fifth Amendment protections against governmental compulsions upon the individual accused of crime. Yet situations may well arise where constructive possession is so clear or the relinquishment of possession is so temporary and insignificant as to leave the personal compulsions upon the accused substantially intact.[16] But this is not the

---

[15] Brief for Petitioner 13. At oral argument petitioner raised a similar concern:

"The Government goes so far as to contend, I believe, with their theory that any time it is out of your actual physical possession it is subject to subpoena . . . . If I were helping you across Constitution Avenue by carrying your briefcase, the Government holds that they could hand me a summons in the middle of Constitution Avenue and seize your documents to use against you in a criminal trial." Tr. of Oral Arg. 14.

[16] See, *e. g., Schwimmer* v. *United States,* 232 F. 2d 855 (CA8 1956), which involved an attorney's partially successful motion to quash two subpoenas *duces tecum* issued in a grand jury proceeding against a corporation where the attorney had stored his office files.

case before us. Here there was no mere fleeting divestment of possession: the records had been given to this accountant regularly since 1955 and remained in his continuous possession until the summer of 1969 when the summons was issued.[17] Moreover, the accountant himself worked neither in petitioner's office nor as her employee.[18] The length of his possession of petitioner's records and his independent status confirm the belief that petitioner's divestment of possession was of such a char-

See also *United States* v. *Guterma*, 272 F. 2d 344 (CA2 1959), concerning the storage of taxpayer's personal records in a safe in offices of a corporation which the taxpayer had served as Chairman of the Board. Only the taxpayer and an indicted co-defendant knew the combination of the safe, and the corporation had no access to it. The Court of Appeals upheld the taxpayer's assertion of Fifth Amendment privilege as to his personal records in the face of a grand jury subpoena directed to the corporation.

Petitioner argues these cases support her position (Brief for Petitioner 14–15); the Government argues they can be distinguished from the instant case as involving mere custodial safekeeping of records, not disclosure of their information to a third person (Brief for United States 21). We refrain from judging the merits of such distinctions today.

[17] Tr. of Oral Arg. 31.

[18] As we noted, *supra,* at 324, his status is that of an independent contractor. He actually did "very little work for the petitioner," had many other clients, and was compensated by the job. Tr. of Oral Arg. 8.

This is a significant point. The Government noted in oral argument:

"In the Internal Revenue Service practice, so long as the taxpayer has retained possession of the records and they are being used only by his full-time employees or others on the taxpayer's premises, without the taxpayer having relinquished possession and control of the records, we ordinarily in those situations issue the summons to the taxpayer, because it is the taxpayer who has the dominion over the records and the authority to return the summons. And if the taxpayer chooses to plead the privilege against self-incrimination, that is up to the taxpayer." Tr. of Oral Arg. 30.

acter as to disqualify her entirely as an object of any impermissible Fifth Amendment compulsion.

## IV

Petitioner further argues that the confidential nature of the accountant-client relationship and her resulting expectation of privacy in delivering the records protect her, under the Fourth and Fifth Amendments, from their production. Although not in itself controlling, we note that no confidential accountant-client privilege exists under federal law, and no state-created privilege has been recognized in federal cases, *Falsone* v. *United States,* 205 F. 2d 734 (CA5 1953), cert. denied, 346 U. S. 864; *Gariepy* v. *United States,* 189 F. 2d 459, 463–464 (CA6 1951); *Himmelfarb* v. *United States,* 175 F. 2d 924, 939 (CA9 1949), cert. denied, 338 U. S. 860; *Olender* v. *United States,* 210 F. 2d 795, 806 (CA9 1954). Nor is there justification for such a privilege where records relevant to income tax returns are involved in a criminal investigation or prosecution. In *Boyd,* a pre-income tax case, the Court spoke of protection of privacy, 116 U. S., at 630, but there can be little expectation of privacy where records are handed to an accountant, knowing that mandatory disclosure of much of the information therein is required in an income tax return. What information is not disclosed is largely in the accountant's discretion, not petitioner's. Indeed, the accountant himself risks criminal prosecution if he willfully assists in the preparation of a false return. 26 U. S. C. § 7206 (2). His own need for self-protection would often require the right to disclose the information given him. Petitioner seeks extensions of constitutional protections against self-incrimination in the very situation where obligations of disclosure exist and under a system largely dependent upon honest self-reporting even to survive. Accordingly, petitioner here

cannot reasonably claim, either for Fourth [19] or Fifth Amendment purposes, an expectation of protected privacy or confidentiality.

## V

The criterion for Fifth Amendment immunity remains not the ownership of property but the " 'physical or moral compulsion' exerted." *Perlman*, 247 U. S., at 15. We hold today that no Fourth or Fifth Amendment claim can prevail where, as in this case, there exists no legitimate expectation of privacy and no semblance of governmental compulsion against the person of the accused.[20] It is important, in applying constitutional principles, to interpret them in light of the fundamental interests of personal liberty they were meant to serve. Respect for these principles is eroded when they leap their proper bounds to interfere with the legitimate interest of society in enforcement of its laws and collection of the revenues.

The judgment of the Court of Appeals is

*Affirmed.*

---

[19] See n. 6, *supra*. The summons satisfied the requirements in *United States* v. *Powell*, 379 U. S. 48, 57–58 (1964), and, as explained above, the necessary expectation of privacy to launch a valid Fourth Amendment claim does not exist. *Katz* v. *United States*, 389 U. S. 347 (1967).

[20] The dissenting opinion of MR. JUSTICE MARSHALL implies that the Court has created a "bright-line rule that no constitutional right of petitioner is violated by enforcing a summons of papers not in her possession." *Post*, at 344. This implication does not reflect accurately the position of the Court. Indeed, it ignores the language of the Court, *supra*, at 333–335, and nn. 15–18. We do indeed attach constitutional importance to possession, but only because of its close relationship to those personal compulsions and intrusions which the Fifth Amendment forbids. Yet, contrary to any intimation in the dissent, we do not adopt any *per se* rule. We also decline to conjecture broadly on the significance of possession in cases and circumstances not before this Court.

MR. JUSTICE BRENNAN, concurring.

I join the opinion of the Court on the understanding that it does not establish a *per se* rule defeating a claim of Fifth Amendment privilege whenever the documents in question are not in the possession of the person claiming the privilege. In my view, the privilege is available to one who turns records over to a third person for custodial safekeeping rather than disclosure of the information, *United States* v. *Guterma,* 272 F. 2d 344 (CA2 1959), cf. *Schwimmer* v. *United States,* 232 F. 2d 855 (CA8 1956); to one who turns records over to a third person at the inducement of the Government, *Stuart* v. *United States,* 416 F. 2d 459 (CA5 1969); to one who places records in a safety deposit box or in hiding; and to similar cases where reasonable steps have been taken to safeguard the confidentiality of the contents of the records.* The privilege cannot extend, however, to the protection of a taxpayer's records conveyed to a retained accountant for use in preparation of an income tax return, where the accountant is himself obligated to prepare a complete and lawful return. 26 U. S. C. § 7206

---

*In some of these instances, to be sure, the person claiming the privilege would not himself have been the subject of direct Government compulsion. And there is no doubt that the Fifth Amendment is concerned solely with *compulsory* self-incrimination. But surely the availability of the Fifth Amendment privilege cannot depend on whether or not the owner of the documents is compelled personally to turn the documents over to the Government. If private, testimonial documents held in the owner's own possession are privileged under the Fifth Amendment, then the Government cannot nullify that privilege by finding a way to obtain the documents without requiring the owner to take them in hand and personally present them to the Government agents. Where the Government takes private records from, for example, a safety deposit box against the will of the owner of the documents, the owner has been compelled, in my view, to incriminate himself within the meaning of the Fifth Amendment.

(2). It is clear on the facts of this case that the tax-payer has voluntarily removed these records from that "'private enclave where [she] may lead a private life . . . ,'" *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 55 (1964), quoting *United States* v. *Grunewald,* 233 F. 2d 556, 581–582 (CA2 1956) (Frank, J., dissenting), rev'd, 353 U. S. 391 (1957), and for that reason I would affirm the judgment below.

MR. JUSTICE DOUGLAS, dissenting.

I cannot agree with the majority that the privilege against self-incrimination was not available to the peti-tioner merely because she did not have possession of the documents in question and was not herself subject to compulsory process. The basic concerns which, in my opinion, underlie the privilege are more subtle and far-reaching than mere aversion to the methods of the Inquisition and the Star Chamber and their modern counterparts.[1] The decision today sanctions yet another tool of the ever-widening governmental invasion and oversight of our private lives. As I urged in dissent in *Warden* v. *Hayden,* 387 U. S. 294, 325, without the right of privacy "the Fourth Amendment and the Fifth are ready instruments for the police state that the Framers sought to avoid."

I

By looking solely to the historical antecedents of the privilege and focusing on "the ingredient of personal compulsion," the majority largely ignores the interplay

---

[1] This is not to say, of course, that we must not be acutely alert to any "recurrence of the Inquisition and the Star Chamber, even if not in their stark brutality." *Ullmann* v. *United States,* 350 U. S. 422, 428 (1956). See, *e. g., Miranda* v. *Arizona,* 384 U. S. 436 (1966).

of the fundamental values protected by the Fourth and Fifth Amendments. As early as 1886, the Court recognized that issues often cannot be pigeonholed within one amendment or the other, thereby foreclosing consideration of related policies. *Boyd* v. *United States,* 116 U. S. 616. In dealing with the compulsory production of a private paper for use in a forfeiture proceeding, the Court stated:

> "The principles laid down [in *Entick* v. *Carrington,* 19 How. St. Tr. 1029, 95 Eng. Rep. 807] affect the very essence of constitutional liberty and security. . . . [T]hey apply to all invasions on the part of the government and its employés, of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offence . . . . Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation of that judgment. In this regard the Fourth and Fifth Amendments run almost into each other." *Id.,* at 630.

Although the subpoena in *Boyd* was directed at the person asserting the privilege, that fact cannot be allowed to obscure the basic thrust of the Court's reasoning: the Fourth and Fifth Amendments delineate a "sphere of privacy" which must be protected against governmental

intrusion.² We confirmed in *Murphy* v. *Waterfront Comm'n*, 378 U. S. 52, 55, that "our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life'" is a fundamental policy underlying the Fifth Amendment.

The majority contends, however, that petitioner cannot reasonably claim "an expectation of protected privacy or confidentiality." The reasons asserted for this position overlook the nature of the accountant-client relationship. The accountant, an agent for a specified purpose—*i. e.*, completing the petitioner's tax returns—bore certain fiduciary responsibilities to petitioner. One of those responsibilities was not to use the records given him for any purpose other than completing the returns. Under these circumstances, it hardly can be said that by giving the records to the accountant, the petitioner committed them to the public domain.³

---

² The Court in *Boyd* also stated that it was unable "to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself. We think it is within the clear intent and meaning of those terms." *Id.*, at 633. Subsequent decisions, however, have refused to apply the privilege to bar the introduction of "testimonial" evidence where the author no longer has any property rights or a valid claim to confidentiality and privacy. See, *e. g.*, *Perlman* v. *United States*, 247 U. S. 7; *Johnson* v. *United States*, 228 U. S. 457. Obviously, the Court is not disposed to reconsider those decisions as they apply to instances where the author has not knowingly and intelligently waived his privilege against self-incrimination. In any event, I do not believe it is necessary to reach that issue here because, as I will discuss below, I believe that the petitioner has a valid claim to confidentiality and privacy.

³ The majority states that what information to disclose in the petitioner's tax returns is largely in the accountant's discretion. Therefore, it argues, the accountant's own need for self-protection

I defined what I believe to be the boundaries of this right to privacy in *Warden* v. *Hayden,* 387 U. S., at 323:

"The constitutional philosophy is, I think, clear. The personal effects and possessions of the individual (all contraband and the like excepted) are sacrosanct from prying eyes, from the long arm of the law, from any rummaging by police. Privacy involves the choice of the individual to disclose or to reveal what he believes, what he thinks, what he possesses. The article may be a nondescript work of art, a manuscript of a book, a personal account book, a diary, invoices, personal clothing, jewelry, or whatnot. Those who wrote the Bill of Rights believed that every individual needs both to communicate with others and to keep his affairs to himself. That dual aspect of privacy means that the individual should have the freedom to select for himself the time and circumstances when he will share his secrets with others and decide the extent of that sharing."

The majority, by the seeming implications of its opinion, has cleared the way for investigatory authorities to compel disclosure of facets of our life we heretofore considered sacrosanct. We are told that "situations may well arise where . . . the relinquishment of possession is so temporary and insignificant as to leave the personal compulsions upon the accused substantially intact." I can see no basis in the majority opinion, however, for stopping short of condemning only those intrusions resting on compulsory process against the author of the thoughts or documents. Are we now to encourage med-

---

(to answer a possible charge of assisting in the preparation of a false return) would often require the right to disclose the information given him. It may be that the accountant's fiduciary responsibilities must yield in this event, but that was not the case here.

dling by the Government and ever more ingenious methods of obtaining access to sought-after materials? The premium now will be on subterfuge, on bypassing the master of the domain by spiriting the materials away or compelling disclosure by a trusted employee or confidant.[4] Inevitably, this will lead those of us who cherish our privacy to refrain from recording our thoughts or trusting anyone with even temporary custody of documents we want to protect from public disclosure. In short, it will stultify the exchange of ideas that we have considered crucial to our democracy.

## II

The decision may have a more immediate impact which the majority does not consider. Our tax laws have become so complex that very few taxpayers can afford the luxury of completing their own returns without professional assistance. If a taxpayer now wants to insure the confidentiality and privacy of his records, however, he must forgo such assistance. To my mind, the majority thus attaches a penalty to the exercise of the privilege against self-incrimination. It calls for little more discussion than to note that we have not tolerated such penalties in the past. Cf. *Uniformed Sanitation Men* v. *Commissioner of Sanitation*, 392 U. S. 280; *Gardner* v. *Broderick*, 392 U. S. 273.

---

[4] The majority notes that "the accountant himself worked neither in petitioner's office nor as her employee." I cannot see how that factor bears on whether the "ingredient of personal compulsion against [the] accused" is present, or whether the accountant was a confidant. The majority would seem to suggest, however, that petitioner, because her business did not call for, or because she could not afford, a full-time accountant, deserves less protection under the Fifth Amendment than a taxpayer more fortunately situated.

## III

Thus, I would reverse the decision below, finding that the subpoena violated both petitioner's Fourth and Fifth Amendment rights.[5] I offer one more observation. The majority cautions that respect for our constitutional principles is eroded "when they leap their proper bounds." We should not be swayed by the popular cry for a formalistic and narrow interpretation of those provisions which safeguard our fundamental rights.

It is a Constitution we are construing, not a legislative-judicial code of conduct that suits our private value choices or that satisfies the appetite of prosecutors for more and more shortcuts that avoid constitutional barriers. Those constitutional barriers and the judicial traditions supporting them are the sources of the privacy we value so greatly. That privacy "protects people," not places, under the Fourth Amendment, *Katz* v. *United States,* 389 U. S. 347, 353. And, as already noted, *Boyd* v. *United States, supra,* held that when it comes to the "forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods," that is an illustration of the manner in which "the Fourth and Fifth Amendments run almost into each other." 116 U. S., at 630.

One's privacy embraces what the person has in his home, his desk, his files, and his safe as well as what he

---

[5] In holding that "mere evidence" is not protected from seizure under the Fourth Amendment, the Court expressly refused to consider "whether there are items of evidential value whose very nature precludes them from being the object of a reasonable search and seizure." *Warden* v. *Hayden,* 387 U. S. 294, 303. The answer to that question was clear to me when I dissented in that case and remains clear to me now.

carries on his person. It also has a very meaningful relationship to what he tells any confidant—his wife, his minister, his lawyer, or his tax accountant. The constitutional fences of law are being broken down by an ever-increasingly powerful Government that seeks to reduce every person to a digit.

MR. JUSTICE MARSHALL, dissenting.

I cannot agree with the majority that the Constitution permits the Government to enforce the summons issued in this case. The opinion of the Court fails to articulate the basis of its result in a way that addresses the range of constitutional concerns involved.[1] The majority seems to create a bright-line rule that no constitutional right of petitioner is violated by enforcing a summons of papers not in her possession. Like MR. JUSTICE BRENNAN, I could not accept such a rule. However, the majority blurs the line by suggesting that temporary relinquishment of possession presents a different case, see *ante*, at 333. The Court expressly disclaims the proposition that possession alone is determinative of the availability of constitutional protection for petitioner's papers. *Ante*, at 336, and 333 n. 16. But neither the opinion of the Court nor the concurring opinion of MR. JUSTICE BRENNAN supplies a clearly articulated constitutional basis for the rule adopted. If the considerations that underlie the Court's expressed concerns are stated explicitly, I think it is clear that the Court has failed to apply correctly the standards which

---

[1] In part this results from the conflation of petitioner's claims under the Fourth and Fifth Amendments. See *ante*, at 325–326, n. 6. But the constitutional claims are complicated, and their articulation is difficult. The opinion of the Court does not, I believe, present an acceptable rationale for its holding.

it appears to find relevant.[2]  I agree, of course, that possession does not define the limits of the protection that the Constitution affords to private papers, and add these comments to indicate how I would treat claims like petitioner's.

A. I begin with *Boyd* v. *United States,* 116 U. S. 616 (1886), whose continuing vitality is indicated by the majority's effort to distinguish it.  That was a suit for the forfeiture of 35 cases of plate glass alleged to have been illegally imported.  In the course of the forfeiture proceeding, the Government introduced into evidence an invoice of a prior shipment.  The defendants objected on the ground that the use of the invoice violated their rights under the Fourth and Fifth Amendments, because the invoice was a private paper secured by a subpoena.  This Court found a violation of both amendments.

One might interpret *Boyd* as holding that the Fifth Amendment prohibits the use of private papers in a criminal proceeding over the author's objection.  The words of the Fifth Amendment surely can be read in that way.  The use of the papers over objection "compel[s the author] in [a] criminal case to be a witness against himself."  The compulsion occurs when the paper is introduced over objection, not when the paper is written or subpoenaed.

---

[2] It may be that everything in this opinion is implicit in the opinion of the Court.  The majority recognizes the importance of the purposes of the transfer, *ante,* at 334, the steps taken to protect the privacy of the records, *ibid.,* and the ordinary operations of the recipient, *ibid.*  I would be pleased to discover that we had no serious disagreements about the guiding principles in this case, but only a relatively minor disagreement about its proper disposition.

But that interpretation has not been adopted by this Court. See, *e. g., Perlman* v. *United States,* 247 U. S. 7 (1918); *Johnson* v. *United States,* 228 U. S. 457 (1913). And in some possible cases, consistent application of that interpretation of *Boyd* might lead to results at odds with common sense.[3]

Another interpretation of *Boyd* has been accepted by this Court and by the leading commentators. See, *e. g., Curcio* v. *United States,* 354 U. S. 118, 125 (1957); 8 J. Wigmore, Evidence § 2264 (McNaughton rev. 1961); C. McCormick, Evidence §§ 126–127 (2d ed. 1972). When a party produces potentially incriminating evidence in response to a summons or subpoena, he implicitly testifies that the evidence he brings forth is in fact the evidence demanded. "The custodian's act of producing books or records in response to a subpoena *duces tecum*

---

[3] For example, suppose a noted criminal lawyer walked into a police station and presented the desk sergeant with his handwritten confession to the arson of his neighbor's house. *Boyd* v. *United States,* 116 U. S. 616 (1886), read as suggested in the text, would bar the use of that document if, at trial, the defendant objected.

That case might be analyzed as a problem of waiver: did the manner in which the author revealed the paper indicate a knowing decision to surrender his rights? The cases that stand in the way of the simplest interpretation of *Boyd* might be treated similarly. But the "waiver" in those cases was not a waiver in the ordinary sense. In *Johnson,* for example, the defendant had been indicted for concealing money from his trustee in bankruptcy. The Bankruptcy Act required that he turn over his books to the trustee, and the books were used against Johnson in the criminal case. The transfer of the books was required if Johnson was to have the benefits of bankruptcy available to him. To make that transfer a waiver of Fifth Amendment rights would be to impose an unconstitutional condition.

Still, even if "waiver" is an inappropriate term here, the underlying notion that someone may behave in a way that indicates a relinquishment of his constitutional rights is sound. I rely on it as the proper term to use in analyzing claims like petitioner's. See *infra,* at 350.

is itself a representation that the documents produced are those demanded by the subpoena. Requiring the custodian to identify or authenticate the documents for admission in evidence merely makes explicit what is implicit in the production itself." *Curcio* v. *United States,* 354 U. S., at 125.

The potential for incrimination inherent in the act of production is illustrated by this case. The summons here called for the production of "[a]ll books . . . pertaining to the tax liability of" petitioner. Had the summons been directed to her, she would have implicitly testified, on producing some papers, that these were "all" the records sought. The Internal Revenue agents believed that she may have understated her income. Their belief might have been confirmed on examining all of her records, but not on examining only some of them. The records could then be used in a subsequent criminal prosecution for underreporting her income. If she produced only some of her books, though, she would be liable for contempt of the order. The Fifth Amendment was designed to prevent the Government from placing potential defendants in such a position. Cf. *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 55 (1964).

These considerations operate only against the person in possession of the papers, as the majority correctly points out. In this case, the accountant to whom the summons was directed made no claim that turning over the records he has might incriminate him, for example, by exposing him to the charge that he had perjured himself in representing that the return prepared for petitioner was correct to the best of his knowledge and belief, 26 U. S. C. § 6065, or that he had knowingly aided in the preparation of a false return, 26 U. S. C. § 7206 (2). Nor could he be held to have represented more than that he had produced all the records in his possession.

However, the accepted interpretation of *Boyd* has an odd sound to it. *Boyd* emphasized that the invoice there was a private paper written by the defendants. Yet the accepted interpretation of the case makes the authorship and contents of the paper largely irrelevant. What is incriminating about the production of a document in response to an order is not its contents, as one might have thought, but the implicit authentication that the document is the one named in the order.[4] If that is the only way rationally to interpret *Boyd*, it might make sense to do so.[5] But it makes better sense to devise a rationale that focuses on the obvious concern of the case, the desire of the author of documents to keep them private.

B. This Court also held in *Boyd* that the Fourth Amendment was violated. Indeed, much of the opinion is devoted to a discussion of *Entick* v. *Carrington*, 19 How. St. Tr. 1029, 95 Eng. Rep. 807 (1765), a landmark in the development of the prohibition against unreasonable searches and seizures. Here, too, the doctrinal basis of the holding is unclear, in part because the Court

---

[4] Another way of seeing the oddity of this interpretation is to consider whether the person who produces documents other than those called for has committed perjury. Perhaps he has, but the perjury is an unusual one. Yet perjury is the third horn of the "cruel trilemma" that the Fifth Amendment was designed to eliminate.

[5] Another interpretation of *Boyd* makes ownership crucial. A person who owns something has the right to exercise a great deal of control over it. When the Government seizes it, the owner is compelled to give up that right. This interpretation is consistent with the observation in *Boyd* that contraband and instrumentalities of crime can be seized because the Government has a superior property right in them. However, this interpretation runs into the same difficulties as the accepted one; in particular, it makes the authorship and content of the property irrelevant. And the emphasis on property rights in this area has since been abandoned. See, *e. g.*, *Warden* v. *Hayden*, 387 U. S. 294 (1967).

correctly perceived that "[i]n this regard the Fourth and Fifth Amendments run almost into each other." 116 U. S., at 630.

*Boyd* suggested that the Fourth Amendment prohibited the seizure of "mere evidence." 116 U. S., at 623–624. See *Gouled* v. *United States,* 255 U. S. 298 (1921). Searches for mere evidence were unreasonable even if such searches were sure to produce evidence leading to a conviction. The precise contours of the "mere evidence" rule were shaped by concepts of property law which we now see as outmoded. See *Warden* v. *Hayden,* 387 U. S. 294, 303–307 (1967). But those concepts attempted to define, however imprecisely, a sphere of personal privacy that the Government could not enter over objection. See, *e. g., Gouled* v. *United States, supra,* at 304. And when this Court repudiated the "mere evidence" rule, it suggested that Fourth Amendment limitations might be devised precisely in terms of the interest in privacy, prohibiting the seizure of "items of evidential value whose very nature precludes them from being the object of a reasonable search and seizure." *Warden* v. *Hayden,* 387 U. S., at 303. Cf. *Stanford* v. *Texas,* 379 U. S. 476, 485 (1965).

The Fourth and Fifth Amendments do not speak to totally unrelated concerns. Cf. *Griswold* v. *Connecticut,* 381 U. S. 479, 484–485 (1965); *Murphy* v. *Waterfront Comm'n,* 378 U. S., at 55. Both involve aspects of a person's right to develop for himself a sphere of personal privacy. Where the Amendments "run almost into each other," I would prohibit the Government from entering.[6] The problem, as I see it, is to develop criteria

---

[6] I recognize that there is an alternate view, that unless a Fifth Amendment privilege is involved, the Fourth Amendment authorizes intrusion when it is not unreasonable. However, this Court has held that increasingly severe standards of probable cause are necessary to justify increasingly intrusive searches. Cf. *Camara* v.

for determining whether evidence sought by the Government lies within the sphere of activities that petitioner attempted to keep private. Cf. *Katz* v. *United States,* 389 U. S. 347, 351–352 (1967).

The first criterion, as *Hayden* suggests, is the nature of the evidence. Diaries and personal letters that record only their author's personal thoughts lie at the heart of our sense of privacy. In contrast, I see no bar in the Fourth or Fifth Amendment to the seizure of a letter from one conspirator to another directing the recipient to take steps that further the conspiracy. Business records like those sought in this case lie between those cases. We are not so outraged by the intrusion on privacy that accompanies the seizure of these records as we are by the seizure of a diary, yet the records could not easily be called "instrumentalities" of tax evasion, particularly if they are accurate.

Second, we must consider the ordinary operations of the person to whom the records are given. A transfer to a lawyer is protected, not simply because there is a recognized attorney-client privilege, but also because the ordinary expectation is that the lawyer will not further publicize what he has been given. Again in contrast, a transfer to a trustee in bankruptcy or to a clerk of a court does not usually carry with it such expectations. That is how I would justify *Johnson* and *Perlman.* Here, too, the transfer in this case lies between the extremes. It would be relevant to a decision about the expectation of privacy that an accountant-client priv-

---

*Municipal Court,* 387 U. S. 523 (1967); *Terry* v. *Ohio,* 392 U. S. 1 (1968); *Stanford* v. *Texas,* 379 U. S. 476 (1965). The precise elements required of a Fifth Amendment violation need not coincide exactly with the elements of an invasion of privacy that should be considered unreasonable, and I see no reason to confine the sphere of privacy free from intrusion to just what the Fifth Amendment protects.

ilege existed under local law, but not determinative. Petitioner disclaimed reliance on such a privilege. Tr. of Oral Arg. 7. But I would think that, privileged or not, a disclosure to an accountant is rather close to disclosure to an attorney.

Third, the purposes for which the records were transferred is an element of an informed judgment about the author's interest in the privacy of the papers. That a transfer is compelled by practical considerations if the author is to claim benefits available under the law, seems to me quite important. If petitioner had sought to take advantage of some complicated provision of the tax laws, and needed the help of an accountant to do so, I would be quite reluctant to hold that the transfer of her records was a surrender of the privacy of the papers. But cf. *Johnson* v. *United States,* 228 U. S. 457 (1913). As I understand it, the majority's exception for temporary relinquishment of possession, and several of MR. JUSTICE BRENNAN's exceptions, recognize the importance of this criterion.

Finally, we must take into account the steps that the author took to insure the privacy of the records. Cf. *In re Harris,* 221 U. S. 274, 280 (1911). Placing them in a safe deposit box is different from letting them remain for many years with an accountant.

It is not impossible that petitioner had indeed abandoned her claim to privacy in the papers sought by summons in this case. But the District Court and the Court of Appeals applied a rather rigid test which made possession alone conclusive. Those courts have more experience than we do with the ordinary practices of taxpayers, accountants, and Internal Revenue agents. They are therefore better able, in the first instance, to apply the criteria I believe are relevant, in light of their understanding of the ordinary practices in such cases. I would vacate the judgment and remand the case to the District Court for consideration of those criteria.