**In re Grand Jury Subpoena served upon J. K. LASSER & COMPANY.**

**Ira and Charlotte DUCHAN, Movants.**

**No. 78 C 447.**

United States District Court,
E. D. New York.

March 17, 1978.

Kalman V. Gallop, New York City, for movants.

Edward R. Korman, Brooklyn, N. Y. (David G. Trager, U. S. Atty. and Michael H. Soroka, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for the Government.

MEMORANDUM and ORDER

DOOLING, District Judge.

Earlier than March 31, 1977, the taxpayers were under investigation by the grand jury with respect to their income tax returns for years before the taxable year 1976. The grand jury investigation had been a continuing one and in connection with it the United States Attorney under date of March 1, 1978, issued a subpoena duces tecum to J. K. Lasser & Company, requiring the firm to produce before the grand jury "any and all work papers prepared by you or under your supervision or prepared by any member of your firm in connection with the preparation of Ira and Charlotte Duchan's 1976 Joint Federal Income Tax Return, including but not limited to the retained copies and schedules of the 1976 Tax Return . . . .."

The taxpayers had consulted counsel before their 1976 United States and New York State Income Tax Returns were due to be filed. While the affidavit submitted in support of the taxpayers' motion to quash the grand jury subpoena does not explicitly so state, it was stated at oral argument, and appears evident, that the

taxpayers consulted counsel not only with respect to the ongoing grand jury investigation of their tax returns for earlier years but also in connection with the steps to be taken in connection with filing the 1976 return. Although again the affidavit in support of the motion does not so state, it was said at oral argument, and is fairly apparent, that counsel concluded that it was important that any tax return filed for the year 1976 not contain any statements that might be used in evidence against the taxpayers in connection with the investigation of their tax affairs for earlier years. It was concluded, however, in the light of *United States v. Sullivan,* 1927, 274 U.S. 259, 263–264, 47 S.Ct. 607, 71 L.Ed. 1037, and *Garner v. United States,* 1976, 424 U.S. 648, 664, 96 S.Ct. 1178, 47 L.Ed.2d 370, that the return to be filed should not contain anything beyond the first page, and should not contain any self-accusatory statements or any disclosures that could be used in evidence against the taxpayers in connection with their returns of the previous years. Again, the affidavit in support of the motion does not spell out these facts; however, it is readily inferable that, as stated at the oral argument by the taxpayers' counsel, he concluded that his course involved three steps: *first,* to have his clients comply with the mandate of *Garner* and *Sullivan,* and at the same time avoid self-incrimination by not filling out those parts of the tax return which might supply incriminating admissions or might lead to the discovery of evidence that could be used to show that they had evaded tax in earlier years; *second,* it seemed to counsel imperative that the maximum possible extension of time to file the tax return should be obtained (and, accordingly, by apparently appropriate steps, an extension of time to mid-October was obtained, 90% of the estimated tax being paid with the filing of the application for an extension of time); and *third,* that an accountant should be retained "to prepare the Federal, State and City Income Tax Returns for Charlotte and Ira Duchan."

Presumably after some advance contact, the taxpayers' counsel wrote Leon Hariton, a certified public accountant then associated with J. K. Lasser & Co., saying that, "Pursuant to my discussion with Ira Duchan, this letter is to confirm your retention to gather information for the preparation of the 1976 Tax Returns for Ira and Charlotte Duchan. It is understood that you are being retained by me and will work under my direction."

The accountant prepared 1976 Federal, State and City Tax Returns for the Duchans, billed the taxpayers' counsel for his services, and was paid by a check drawn by counsel on his account under date of July 13, 1977. The first pages of the two tax returns prepared by the accountant were signed by him as preparer without date and were signed by the taxpayers under date of October 12, 1977, and the Federal Tax Return was sent to the Internal Revenue Service Center on October 13, 1977, by counsel under a letter advising that the taxpayer Ira Duchan was currently the subject of an investigation into his Federal Income Taxes and that taxpayer Ira Duchan had the right to and did through counsel assert his Fifth Amendment privilege against self-incrimination and "therefore cannot at this time file complete individual income tax returns for the year 1976", but that he was submitting a photostatic copy of page one of a 1040 return for 1976 in compliance with the decisions in *Sullivan* and *Garner.* Later the Internal Revenue Service wrote asking for the filing of the remaining schedules or pages of a completed form of income tax return, and that was not done. Apparently thereafter the subpoena was issued by the grand jury for the papers in the possession of J. K. Lasser & Co.

*Couch v. United States,* 1973, 409 U.S. 322, 327, 93 S.Ct. 611, 615, 34 L.Ed.2d 548, speaking of the privilege against self-incrimination, emphasized that

"By its very nature, the privilege is an intimate and personal one. It respects a private inner sanctum of individual feeling and thought and proscribes state intrusion to extract self-condemnation. Historically, the privilege sprang from an abhorrence of governmental assault

against the single individual accused of crime and the temptation on the part of the State to resort to the expedient of compelling incriminating evidence from one's own mouth."

*Couch* dealt with enforcing a production summons to produce a taxpayer's records directed to the taxpayer's accountant, and the Court continued by saying (409 U.S. at 329, 93 S.Ct. at 616)

"In the case before us the ingredient of personal compulsion against an accused is lacking. The summons and the order of the District Court enforcing it are directed against the accountant. He, not the taxpayer, is the only one compelled to do anything. And the accountant makes no claim that he may tend to be incriminated by the production." (footnote numeral and footnote omitted.)

Rejecting the argument that the taxpayer's ownership of the records gave an entitlement to assert the privilege even though they were in the hands of the accountant, the Court did, however, point out that, while the Court indeed believed

" . . . that actual possession of documents bears the most significant relationship to Fifth Amendment protections against governmental compulsions upon the individual accused of crime. Yet situations may well arise where constructive possession is so clear or the relinquishment of possession is so temporary and insignificant as to leave the personal compulsions upon the accused substantially intact. But this is not the case before us. Here there was no mere fleeting divestment of possession: the records had been given to this accountant regularly since 1955 and remained in his continuous possession until the summer of 1969 when the summons was issued." (409 U.S. at 333–34, 93 S.Ct. at 618, footnote numerals and footnotes omitted).

In concluding the Court said (409 U.S. at 336, 93 S.Ct. at 619)

"We hold today that no Fourth or Fifth Amendment claim can prevail where, as in this case, there exists no legitimate expectation of privacy and no semblance of governmental compulsion against the person of the accused." (footnote numeral and footnote omitted).

It is clear that in the present case the preservation of the underlying privilege against self-incrimination is dependent on whether or not the communication to the accountant of the data theretofore protected from compelled production by the Fifth Amendment resulted in a termination of the privilege. Plainly the communication of it to counsel and to no one but counsel would not have terminated the privilege. But perhaps it is as well to keep in mind that once the person claiming the privilege has made disclosure of the data to anyone, in a certain sense the privilege against self-incrimination has been put at risk. Everything then depends on the data being supported in the further extension of their initial immunity to disclosure upon the existence of a secondary privilege like that of attorney-client or, conceivably, penitent-confessor. Since in this State there is no accountant-client privilege, the endurance of the Fifth Amendment privilege depends on whether the communication to the accountant was, substantively, a communication to counsel and protected as such.

It is clear enough that in some circumstances the lawyer's invoking the assistance of an accountant in dealing with confidential data committed to him by a client does not terminate either the attorney-client privilege or the underlying privilege against self-incrimination. As Judge Friendly put it in *United States v. Kovel,* 2d Cir., 1961, 296 F.2d 918, 922,

"Accounting concepts are a foreign language to some lawyers in almost all cases, and to almost all lawyers in some cases. Hence the presence of an accountant, whether hired by the lawyer or by the client, while the client is relating a complicated tax story to the lawyer, ought not to destroy the privilege any more than would that of the linguist in the second or third variations of [a foreign language hypothetical case discussed earlier in the opinion]; the presence of the accountant is necessary, or at least highly

useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit. By the same token, if the lawyer has directed the client, either in the specific case or generally, to tell his story in the first instance to an accountant engaged by the lawyer, who is then to interpret it so that the lawyer may better give legal advice, communications by the client reasonably related to that purpose ought fall within the privilege; there can be no more virtue in requiring the lawyer to sit by while the client pursues these possibly tedious preliminary conversations with the accountant than in insisting on the lawyer's physical presence while the client dictates a statement to the lawyer's secretary or is interviewed by a clerk not yet admitted to practice. What is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer.* If what is sought is not legal advice but only accounting service . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." (emphasis in original; footnote numeral and footnote omitted).

Judge Friendly treated the point again in *In re Horowitz,* 2d Cir. 1973, 482 F.2d 72. *Horowitz* is remarkable principally for Judge Friendly's refusal to attenuate or expand the implications of *Couch.* The attorney-client privilege complication was not really involved, and the question which in the end the Court decided was one having to do with the existence of a "constructive possession" of records by the persons under investigation where it appeared that the records had, after the initiation of an investigation, been transferred to an accountant without any apparent assignment of work to be performed by the accountant, although, apparently, some part of the files were used in connection with a tax audit in which the accountant was involved. The Court decided the case in terms of the Fifth Amendment privilege and held that there was no such constructive possession as *Couch* visualized as conceivably preserving the privilege.

*United States v. Judson,* 9th Cir. 1963, 322 F.2d 460, does not advance the present case, except as it may represent the one clear-cut case in which documents prepared by an accountant were protected from discovery. The Court in *Judson* (322 F.2d at 462) was clear that the net worth statement and the various preliminary memoranda which culminated in it were prepared at the attorney's request in the course of an attorney-client relationship for the purpose of advising and defending the lawyer's clients, and that the accountant's role was to facilitate an accurate and complete consultation between the client and the attorney about the client's finances. As the Government has pointed out, *Judson* is readily distinguishable in the respect that the net worth statement there prepared by the accountant was created at the attorney's request solely for the purpose of facilitating his defense of his client in the tax case. In contrast, the 1976 tax return was required by *Garner* and *Sullivan,* and the decision about the nature and form of the return had been taken by the lawyer in consultation with his client before retaining the accountant and the legal advice given to the client formed the reason for thereafter retaining the accountant's services. That is, the accountant's work could tell the lawyer nothing germane to either the course of action that he was urging upon his client, or, indeed, to sorting out the information which should be withheld from the Internal Revenue Service and that which could be furnished. But there is much in the language of *Judson* which suggests a broader range of considerations.

This and every such case must start with the assumption that the data involved are privileged in the hands of the taxpayer, and would remain privileged from disclosure under the Fifth Amendment claim if sought from the taxpayer's own possession. It was indicated during the oral argument that the Government was particularly interested in interest income and dividend income shown on the 1976 return filed in October 1977. It showed on line 10a dividends of $5,233 (before the exclusion), and, on line 11, interest income of $18,065. The suggestion was

that the work papers might well disclose what institutions paid the dividends and the interest, and thus might enable the Government to discover how long these income producing assets had been owned and had been yielding possibly unreported income. If disclosure of facts about covert income sources was made to counsel only, and the identification of the nominee or other names through which the income came and the identities of the income-paying institutions were given to counsel only, the Government could not have compelled the disclosure of the evidence either from the taxpayer or from his lawyer, provided of course, in the case of the lawyer, that the communication was in confidence and was intended for the purpose of enabling the lawyer to advise the client. If, then, the lawyer had sat down with the client and prepared precisely such a return as was later filed and had filed it with an adequate assertion of the privilege against self-incrimination, there would not be much question that lawyer's papers used in preparing the return and other material which he received from his client would be as privileged from disclosure as they would have been in the client's own hands; the attorney-client privilege continues the taxpayer's underlying privilege against self-incrimination. Hence we are not dealing with a situation in which the communication of data to the lawyer and from the lawyer to the accountant or from the client directly to the accountant and from him to the lawyer is relied upon as creating a privilege for matter which, but for these communications, would not have been privileged. The question here is whether the lawyer's use of an accountant to prepare a return that he might himself have prepared or his client might have prepared under his legal guidance, has resulted in a termination of the privilege that would otherwise have continued.

It is suggested that the use of the accountant was in the nature of a ruse practiced for the purpose of extending the privilege to matter which would not otherwise have been privileged. That does not appear to be the case. In the light of *Couch* and other cases, giving the material to the accountant, having him work up the return and, in that task, develop working papers, could not under any view of the matter have enhanced the probability that the privilege could continue to exist; it could only have put the privilege at risk by volunteering one additional disclosure beyond that to the lawyer, taxing, if not overtaxing, the strength of the underlying privileges—privileges rooted in confidentiality—through a voluntary disclosure to a person not normally a privileged custodian of confidences. While only line 12 on page 1 of the return, recording income of $3,575, does not clearly disclose the nature of the income and its taxable quality, and the, inferentially, large deductions claimed to be allowable are not indicated, the return would, superficially appear to have been a very simple return in terms of tax computations. Counsel stated at the argument that he sent the material to the accountant to prepare the return because he regarded tax computations and the preparation of tax returns as outside the purview of his legal expertise; he sent the material to the accountant as, he indicated, he would have sent, and did usually send, his own tax return data to an accountant to prepare his own return. But what accounting concept is mysteriously present here?

Very plainly resort to the accountant was not necessary to put into effect the legal advice which had already been given to the client. In abstract theory, at least, lawyer and client sitting down together could at once have put the advice into effect by using the instruction booklet that accompanies Form 1040. But, if, regrettably, it seems to be true that busy individual practitioners of the law do not ordinarily prepare tax returns for their clients or themselves, but ordinarily do use a tax accountant to do this work, regarded not exactly as ministerial, but simply because such work calls for an amount of time and effort that a lawyer could devote to tax returns only at exorbitant cost to his client and with an amount of specific research disproportionate to the nature of the tax return filing occasion: if that is so, what is the consequence in this context? An accountant, or

a tax accountant, can probably prepare a tax return in a fraction of the time that a busy individual practitioner would have to devote to the same effort. Thus, while the accountant is not indispensably necessary to giving affect to the lawyer's advice about filing the return, it would be difficult to say that the use of tax accountants to prepare returns by reference from attorneys is either unusual or improper. What, then, is the consequence of the lawyer's employing an accountant to do what he could himself have done (preserving the privilege), where the accountant's service is not sought to create or reinforce or enhance the privilege, but simply to minimize the client's expense by using the accountant as the lawyer's neutral data processing device? Accepting that, as *Garner* makes explicit, the case is not to be viewed in terms of a conscious and voluntary waiver of an understood constitutional right—and to find that in this context seems impossible—the ultimate suggestion of the Government's position would appear to be that in every case in which a *Sullivan-Garner* return is sought to be filed with preservation of the Fifth Amendment privilege, the taxpayer must prepare his own return and sign his own assertion of the privilege or do it in conjunction with his attorney alone, without using an accountant's assistance, unless, perhaps, in the case of a return of tax so formidably complex that preparation of the return was peculiarly the special task of a qualified tax accountant, and such accountant worked under the supervision of the lawyer or of the client alone. One apparent difficulty with adopting any other suggestion than that of the Government in such cases as this is that a moment's analysis suggests that the lawyer's intervention is totally beside the point; that is, if reference to an accountant is necessary because of the sheer accounting complexity of the matter, in logic the accountant's working papers should be immune from compelled disclosure even in the case in which the taxpayer consults the accountant directly and does not consult a lawyer. It would appear that in that sort of case reliance would have to be placed on the "constructive possession" reservation in *Couch.*

Coming back, then, to such facts as are accessible in a case like the present one, what is clear is that, as modified during the oral argument, the motion to vacate is limited to the materials worked up by the accountant in connection with his preparation of the return form. It is somewhat difficult to see what there was to be communicated to the accountant beyond totals of dividends and totals of interest amounts without identification of source, for identification of source could hardly help the accountant in his computations, or simplify his work. But these are speculative considerations and the Government's point essentially is that, the lawyer's advice having preceded the reference to the accountant, it could not make any difference what was communicated to the accountant; it could not be thought to aid in the granting of legal advice. See *United States v. Kovel, supra,* 296 F.2d at 922.

The argument of substance to be made for holding that the privilege against self-incrimination has not terminated but has been preserved at its second stage through the attorney-client privilege is that implicit in the part of the *Kovel* case just cited. That is, is this a case where the conditions are such that the lawyer needed outside accounting help for the effective operation of the privilege of client and lawyer, working together in an effort to protect the client's privilege against self-incrimination. It is concluded that the use of an accountant was neither necessary nor highly useful for the effective implementation of the attorney-client plan to pay the tax without disclosing information that might incriminate the taxpayers. There is no showing here that the least complexity attended the simple matter of adding the figures and computing the tax from the table furnished in the instruction pamphlet accompanying the return forms. No difficult question or complex accounting concept was referred to during the oral argument; it appeared only that the reference to the accountant was made as a matter of convenience and possibly economy. In principle it cannot, in effect, be held that it is necessary or particularly appropriate to invoke the services of an accountant to file an apparently simple

tax return. It may not always be easy to describe accounting difficulties without disclosing that which it was the purpose of the procedure to protect from disclosure. But the position taken by the taxpayer went much much farther than that and it was not supported.

It is accordingly,

ORDERED that the motion to quash the grand jury subpoena addressed to J. K. Lasser & Company is in all respects denied.