**UNITED STATES of America**

v.

**Frank C. HILTON, Appellant.**

**No. 75–1441.**

United States Court of Appeals, Third Circuit.

Argued Oct. 16, 1975.

Decided March 30, 1976.

Harold Gondelman, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Pittsburgh, Pa., for appellant.

Blair A. Griffith, U. S. Atty., Samuel J. Orr, III, First Asst. U. S. Atty., Daniel H. Shapira, Asst. U. S. Atty., James J. West, Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

Before ALDISERT, KALODNER and ADAMS, Circuit Judges.

## OPINION OF THE COURT

KALODNER, Circuit Judge.

The defendant Frank C. Hilton appeals from his conviction following a non-jury trial on three counts of an indictment which

1. 18 U.S.C.A. § 1951.

2. 26 U.S.C.A. § 7206(1).

3. 18 U.S.C.A. § 1623.

respectively charged him with (1) extortion in violation of the Hobbs Act;[1] (2) willful understatement of his taxable income in his 1972 federal income tax return;[2] and (3) knowingly making a false material declaration to a grand jury.[3] He was sentenced to a 5-year prison term on the extortion and perjury counts and a 3-year prison term on the income tax count, the sentences to run concurrently.

Hilton does not here contend that the trial evidence was insufficient to sustain the trial court's guilty verdicts on the Hobbs Act, income tax fraud and perjury counts. He urges, however, that some of the evidence adduced at his trial was obtained by the government in violation of his Fourth Amendment rights via an alleged "illegal" search and seizure conducted by federal agents under cover of an alleged "illegal" subpoena duces tecum directed to the Keystone Bank in Lower Burrel, Pennsylvania. He contends that the district court erred in rejecting his Fourth Amendment claims when he presented them in a pre-trial motion to suppress the evidence to which they related. The district court in its Memorandum and Order denying the suppress motion,[4] held that the Keystone Bank had not asserted any "claim of violation of rights" with respect to its surrender of its records, and that Hilton "has no standing to complain."

The challenged evidence is in two categories, viz., (1) records maintained by the Keystone Bank as to two loans aggregating $22,800 which it had made to Hilton and his wife, and (2) Keystone Bank records as to the operation of the checking account of one of its depositors named David N. Oppenheim. The bank's own loan records showed that a $18,523.49 balance due on the Hilton loans on July 19, 1972 was repaid on that date with funds emanating from the Oppenheim checking account, and the bank's records as to the Oppenheim check-

4. The "Memorandum and Order" was filed January 30, 1975.

ing account established that the latter was the source of the $18,523.49 repayment of the Hilton loans on July 19, 1972.

We are of the opinion, for reasons later developed, that the district court did not err in its holding that the defendant lacks standing with respect to his Fourth Amendment claim.

The specifics of the Hilton claim must be prefaced by the following statement of relevant background facts adduced below:

The Keystone Bank loaned $19,800 to Hilton and his wife on September 5, 1968, and $3,000 to Hilton alone on October 30, 1971.

Hilton was Secretary of Property and Supplies of the Commonwealth of Pennsylvania when the second loan was made. As earlier stated, the Hilton loans were repaid on July 19, 1972 via funds from the Oppenheim checking account in the Keystone Bank.

In the late spring of 1974, newspaper reports that Oppenheim's payment of the Hiltons' loans was a "pay-off" for Hilton's placement of state insurance with Oppenheim, an insurance broker, led to a federal grand jury investigation aimed at ascertaining whether federal criminal laws had been violated.

In July 1974, Keystone Bank records relating to loans made to Hilton and his wife were subpoenaed to the grand jury sitting in Pittsburgh, Pennsylvania. The bank records produced in response to the subpoena disclosed that the Keystone Bank on July 19, 1972 was paid a balance of $18,523.49 then due on the Hilton loans.[5]

On August 21, 1974, Hilton appeared voluntarily before the grand jury. He testified that he had repaid the $18,523.49 balance due on his loans with $13,800.00 of his wife's savings and $6,000.00 he had received from the sale of real estate.

In September 1974 Keystone's records relating to certain accounts of Hilton and Oppenheim were subpoenaed to the grand jury. The records produced in response to that subpoena disclosed with respect to the Oppenheim account a deposit of $78,608.09 on July 17, 1972 and a check payable to the Keystone Bank for $18,523.49 dated July 18, 1972. The Hilton account records failed to show any disbursement of $18,523.49.[6]

On October 1, 1974 a third subpoena commanded "any authorized officer" of the Keystone Bank (1) "to testify before the Grand Jury and bring with you" copies of Oppenheim's $78,608.09 deposit slip of July 17, 1972, and his $18,523.49 and $13,063.64 checks dated July 19, [18] 1972; and (2) to produce "forthwith" the specified microfilms for "examination" by "the agents for the Federal Grand Jury who are any authorized Federal Bureau of Investigation agents."

The subpoena, which was captioned "Subpoena to Testify Before Grand Jury," stated that it was issued "on application of the United States of America. . . . Samuel J. Orr, III, U. S. Attorney."

The subpoena was served on the bank on October 3, 1974 by two F.B.I. agents. In response to their demand they were given copies of the bank's microfilm records of the Oppenheim deposit slip and checks, although the subpoena only called for the agent's "examination" of the microfilms.

On October 10, 1974, the F.B.I. agents presented the microfilm copies to the grand jury which later that day returned a perjury indictment against Hilton, at No. 74–302, Criminal. The indictment charged Hilton with falsely testifying in his August 21, 1974 grand jury appearance that he had paid his $18,523.49 debt to the Keystone Bank with his own and his wife's funds.

On November 18, 1974, Hilton moved to dismiss the perjury indictment, and to suppress the evidence obtained by the F.B.I. agents in their service of the October 1, 1974 subpoena.

---

5. Affidavit of Samuel J. Orr, III, Assistant United States Attorney, filed January 3, 1975. The Affidavit is set forth in the Appendix to the Government's Brief.

6. *Id.*

The motion to dismiss the October 10, 1974 indictment alleged that the United States Attorney's office had abused the grand jury process in securing the Oppenheim records by means of a "forthwith" subpoena, and the F.B.I. agents "used unlawful threats, coercion and duress to secure the subpoenaed documents forthwith." [7]

The motion to suppress alleged in substance that the October 1, 1974 subpoena was illegal in that it purportedly constituted F.B.I. agents as "agents of the 'Federal Grand Jury,' and that 'i[n] serving said subpoena duces tecum . . . said agents of the Federal Bureau of Investigation used unlawful threats, coercion and duress to secure the subpoenaed documents forthwith.'"

The district court held an evidentiary hearing on Hilton's two motions on December 13, 1974. The substance of the evidence adduced at that hearing may be epitomized as follows:

The October 1, 1974 subpoena was issued by Assistant United States Attorney Orr without authorization by the grand jury which was in session that day and on October 3, 1974 when the subpoena was served; the grand jury, however, was permitted to recess from October 4, 1974 until October 10, 1974 without waiting for the production of the fruits of the subpoena; Orr specified in the subpoena for "forthwith" examination by the F.B.I. agents of the bank's records as to Oppenheim's July 1972 deposit and checks because he felt "there was a danger of the records being destroyed" in light of a "close relationship" between Oppenheim and the bank by virtue of the fact that Oppenheim was vice-president of the Rockwood Insurance Company which was "the primary stockholder in the Keystone Bank;" [8] the F.B.I. agents who served the subpoena on a vice-president of the bank,

Ronald A. Soloman, requested delivery to them of microfilms of the Oppenheim July 1972 deposit and checks listed in the subpoena; Soloman referred the agents' request to William R. Sutton, another vice-president; Sutton in turn phoned Abraham Fishkin, attorney for the bank, with reference to the agents' request and their expressed refusal to leave without the microfilms; Fishkin, after failing in his attempt to reach Oppenheim, instructed Sutton to deliver the microfilms "since the agents are there and will not leave the premises until you comply, rather than disrupt the bank by having you and Mr. Soloman go downtown, you let them have whatever the subpoena told you to give them." [9]

The district court entered an Order on December 18, 1974 denying Hilton's motions to suppress and to dismiss the indictment. In its Opinion accompanying that Order it held, as earlier stated, that Hilton "has no standing to complain" with respect to the issuance, service and fruits of the October 1, 1974 subpoena since it was directed to the Keystone Bank. In doing so the district court said in relevant part:

> "We, therefore, conclude that even though it might be found that the manner in which these records were obtained by the government constituted an abuse of process amounting to an illegal search and seizure, *any search which occurred was directed against the bank and not this defendant, and this defendant has no standing to complain of a seizure of evidence from another person in violation of that person's Fourth Amendment rights."* App. p. 132a. (emphasis supplied).

On December 23, 1974, the district court revoked its December 18, 1974 [10] Order and continued consideration of Hilton's suppress and dismissal motions pending submission of additional "evidentiary material" and

---

7. Hilton's motion to dismiss also alleged that the United States Attorney's office had made unauthorized disclosure to a Pennsylvania legislative committee of evidence adduced in the grand jury investigation, and "prosecutorily inspired adverse publicity."

8. N.T., pp. 36–38, December 13, 1974 hearing; App. 55a–57a.

9. N.T., p. 76, December 13, 1974 hearing; App. 95a.

10. Memorandum Opinion and Order, December 23, 1974, App. 134a.

further argument, in light of *United States v. Miller*, 500 F.2d 751 (5th Cir. 1974).[11]

On January 3, 1975, Assistant United States Attorney Orr filed an Affidavit which spelled out in greater detail the substance of his earlier testimony at the December 13, 1974 suppression hearing as to the July and September 1974 grand jury subpoenas to the Keystone Bank, and their disclosure as to the repayment of the Hilton loans on July 19, 1972, after Oppenheim had made a deposit on July 17, 1972, of his $78,351.91 commission on the Pennsylvania insurance policy awarded to him by Hilton, and the next day had drawn a check to the order of Keystone Bank for $18,523.49. The Affidavit also spelled out in detail Orr's suppression hearing testimony as to his issuance of the October 1, 1974 "forthwith" subpoena because of his concern that the Oppenheim July 1972 checking account records might be destroyed in light of Oppenheim's close relationship with Keystone Bank.[12] Orr's affidavit also stated that the grand jury was in session when the subpoena was issued and served, and that the evidence yielded by it was presented to the grand jury on October 10, 1974 following its return from a week's recess.

The district court denied Hilton's motions to dismiss the indictment and to suppress evidence in a Memorandum and Order filed January 30, 1975, following a hearing on January 13 and 14, 1975. In doing so it held that "*[t]he party subpoenaed [Key-stone Bank] asserts no claim of violation of rights at this time*," and that Hilton "*has no standing to complain.*"

Hilton sought to appeal the district court's Order via a "Petition Under All Writs Act, 28 U.S.C. § 1651." The petition was denied for lack of jurisdiction on February 21, 1975.

On March 5, 1975, the grand jury separately subpoenaed Keystone Bank and Oppenheim to testify March 11, 1975 and to produce Oppenheim's July 17, 1972 deposit slip for $78,608.09 [13] and Oppenheim's next day checks for $18,523.49 and $13,063.64.

Keystone Bank complied with the subpoena. Oppenheim, however, filed a motion on March 10, 1975 to quash his subpoena. His motion was denied the same day. Oppenheim appeared before the grand jury on March 11, 1975, and pleaded his Fifth Amendment privilege. He was taken before the court which forthwith entered an Order granting him immunity and directing him to testify. Oppenheim then testified before the grand jury which later in the day returned the instant three-count indictment charging Hilton with extortion in violation of the Hobbs Act, income tax evasion and perjury. This indictment superceded the prior October 10, 1974 indictment which only charged Hilton with perjury. The earlier indictment was dismissed on motion of the government on April 7, 1975, at which time Hilton moved again to dismiss the March 11, 1975 indictment and to suppress the evidence on the ground that the subpoena power had been abused.

Oral argument was had on Hilton's motions on April 7, 1975 and they were denied the next day. The proceedings with respect to Hilton's prior motions to dismiss and suppress were incorporated into the record at the oral argument.[14]

Hilton's non-jury trial was held on April 15, 16 and 18, 1975. The notes of testimony of the December 13, 1974 hearing on Hilton's motions to suppress the evidence

---

11. In *United States v. Miller*, 500 F.2d 751 (5th Cir. 1974) it was held that a *bank depositor* had standing to maintain a motion to suppress based on alleged illegal divulgence of his bank's records as to his deposits. The Fifth Circuit later affirmed this holding *en banc*, seven judges dissenting. 508 F.2d 588 (1975), *cert. granted*, 421 U.S. 1010, 95 S.Ct. 2414, 44 L.Ed.2d 678 (1975).

12. Orr's Affidavit is set forth in the Government's Appendix to its Brief.

13. The $78,608.09 deposit included Oppenheim's $78,351.91 commission on the Pennsylvania Insurance policy awarded him by Hilton.

14. On April 11, 1975, Hilton filed a petition under the All Writs Act seeking review of the district court's April 8, 1975 Order denying his motions to dismiss and suppress. We denied his petition on April 18, 1975 at Misc. No. 75–8080.

yielded by the October 1, 1974 subpoena, and to dismiss the prior indictment, were made part of the trial record. Hilton's grand jury testimony that he had satisfied the Keystone Bank loans with $13,000 of his wife's savings and $6,000 he had received from the sale of real estate was also introduced into evidence.

The following original records *maintained by Keystone Bank* were also admitted into evidence:

"Demand Loan Ledger" of *Keystone Bank* with respect to each of the Hilton loans from their inception to their satisfaction;[15] a *Keystone Bank* "proof tape" of matching entries of transactions which disclosed that Oppenheim's July 18, 1972 check, payable to the bank, had been applied on July 19, 1972 to repay the $18,-523.49 balance on the Hilton loans, and that Oppenheim's July 18, 1972 check for $13,-063.64, payable to the bank had been disbursed as cash;[16a] and two Keystone "Payment Slips" noting satisfaction of each of the Hilton loans on July 19, 1972.[16b]

Photocopies of *Oppenheim records* admitted into evidence were:

"Exhibit No. 5"—Oppenheim's July 17, 1972 Keystone Bank deposit slip in the amount of $78,608.09, which separately listed his $78,351.91 commission on the Pennsylvania insurance policy and several other small items aggregating $256.18.

"Exhibit No. 6"—Oppenheim's July 18, 1972 check payable to Keystone Bank in the amount of $18,523.49.

"Exhibit No. 7"—Oppenheim's July 18, 1972 check payable to Keystone Bank in the amount of $13,063.64.

Hilton's joint income tax return for 1972 was also admitted into evidence as bearing on the count charging him with understatement of his taxable 1972 income. The tax return (Exhibit No. 29) listed Hilton's gross income at $29,294—$25,000 state salary, $422 dividends and net income of $3,872, from a chemical business.

It must be noted at this juncture that Keystone Bank records pertaining to Hilton's checking account were not offered in evidence nor were Hilton's own checking account records offered.

Extended discussion of the testimony adduced is not required since Hilton has not challenged its sufficiency to sustain the guilty verdict, and he has chosen to premise his appeal on the ground that some of the evidence, viz., bank records relating to his loans and the Oppenheim July 1972 deposit and checks, had been obtained via the October 1, 1974 subpoena in violation of his Fourth Amendment rights.

Oppenheim testified, in sum, that at Hilton's insistence he agreed to give Hilton a kick-back of $31,587.13 of his $78,351.91 commission on a $602,707 premium on a state insurance policy placed through [the Rockwood Insurance Company,] Oppenheim's brokerage concern;[17] Oppenheim received and deposited his commission on July 17, 1972; and on July 18, 1972 he contacted Herman Israel, president of Keystone Bank, who knew of his "arrangement with Mr. Hilton", "[i]n order to make my payment of 31 thousand some odd dollars to Mr. Hilton, and I had agreed";[18] he was then advised by Israel that $18,543.49 was owing to the bank on the Hilton loans and he drew a check for that amount and a second check for $13,063.64, payable to the Keystone Bank; he gave the two checks to Israel and "asked him to apply the one to Mr. Hilton's obligation at the bank, cash the other and give the cash to Mr. Hilton";[19] Israel had arranged for, and attended, Oppenheim's initial meeting with Hilton with reference to placement of the state insurance policy;[20] Israel also attended a later Oppenheim-Hilton meeting at which Hilton's

---

15. Exhibit Nos. 1, 1a and 3.

16a. Exhibit No. 10.

16b. Exhibit Nos. 8 and 9.

17. App. 311a–313a, 315a and 344a.

18. App. 315a.

19. App. 317a.

20. App. 280a.

kickback payment was discussed;[21] Israel and Oppenheim had been "close business associates . . . [f]or a long time";[22] Israel was chairman of the board of directors of Rockwood Insurance Company which he controlled, and Oppenheim was a major shareholder of the company and a member of its board of directors.[23]

It may be noted at this juncture that Israel pleaded the Fifth Amendment when he was called as a government witness.

Relevant testimony of two officers of the Keystone Bank may be epitomized as follows:

Vice-president William R. Sutton identified the *"Demand Loan Ledger"* cards of the Keystone Bank, (Exhibits 1, 1a and 3) as the *"bank's permanent record[s]"* of the Hilton loans.[24] He also testified that the bank's *"proof tape"* (Exhibit No. 10) indicated that (1) Oppenheim's $18,423.49 check, payable to the Keystone Bank, *"was applied to satisfy the Hilton loans,"* and (2) *"there was cash handed out"* for Oppenheim's $13,063.64 check, payable to the Keystone Bank.[25]

Assistant vice-president John L. Baker testified that he had on March 11, 1975, presented to the grand jury, in response to its subpoena of March 5, 1975, copies of the Keystone Bank's own records as to the Hilton loans and their repayment, and copies of the Oppenheim deposit slip and checks, earlier recited.

The March 5, 1975 subpoena called for the production by Keystone Bank of copies of Oppenheim's July 1972 deposit slips and two checks, and copies of the bank's records pertaining to the deposit slip and checks. The subpoena was introduced into evidence as Exhibit No. 16, over the objection of Hilton's counsel, who had also earlier unsuccessfully objected to the admission into evidence of the bank's records relating to the Hilton loans and the Oppenheim deposit and two checks, on the ground that they had originally been obtained by the government via the "illegally" issued and "illegally" served October 1, 1974 subpoena.

It must be noted parenthetically that Hilton did not testify at his trial.

Considering, as we must, the testimony, in the light most favorable to the government,[26] we find that it amply sustained the trial court's guilty verdict on the counts charging Hilton with violation of the Hobbs Act, income tax evasion, and perjury before the grand jury.

Oppenheim's testimony as to his fulfilled "kickback" deal with Hilton respecting Oppenheim's commission on the state insurance policy established violation of the Hobbs Act. *United States v. Mazzei*, 521 F.2d 639 (3d Cir. 1975), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385, 44 U.S.L.W. 3340 (December 9, 1975). Oppenheim's payment of the $18,523.49 Hilton loans constituted taxable income to Hilton and his failure to report it in his joint 1972 federal income tax return established violation of the revenue laws. The Oppenheim payment of the $18,523.49 Hilton loans also established that Hilton perjured himself when he testified to the grand jury that *he* had repaid the loans with his, and his wife's funds.

What has been said brings us to Hilton's instant challenge to the district court's holding that "this defendant has no standing to complain of a seizure of evidence from another in violation of that person's Fourth Amendment rights,"[27] in denying Hilton's Fourth Amendment claims with respect to the October 1, 1974 subpoena directed to the Keystone Bank.

---

21. App. 304a.

22. App. 341a.

23. App. 340a–341a.

24. App. 213a, 220a.

25. App. 242a.

26. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Trotter*, 529 F.2d 806 (3d Cir., 1976); *United States v. DeCavalcante*, 440 F.2d 1264 (3d Cir. 1971).

27. "Memorandum and Order" filed January 30, 1975.

The Achilles heel of Hilton's challenge is that it is bottomed on his view that "*the bank records of the defendant were secured from the bank* by the Federal Bureau of Investigation agents"[28] pursuant to the October 1, 1974 subpoena. (emphasis supplied).

There is no basis in the record for Hilton's categorization of the records secured via the October 1, 1974 subpoena as "*the bank records of the defendant.*" The record inescapably establishes that the subpoena specifically related to the Oppenheim July 1972 deposit slip and two checks, and "any debit memoranda or any other documents relating" thereto, and that the F.B.I. agents who served the subpoena secured *only* copies of the Keystone Bank's microfilms of the specified Oppenheim deposit slips and checks, and the bank's own "Payment Slips," as to the payment of the Hilton loans.

The hard fact that the records secured by the October 1, 1974 subpoena were *not* "the bank records of the defendant," makes inapposite Hilton's reliance on the Fourth Amendment's provision that "[t]he right of the people to be secure in their persons, houses, *papers and effects*, against unreasonable searches and seizures, . . ." and *United States v. Miller, supra*, which held the Fourth Amendment extended to the *bank records of a depositor.* (emphasis supplied).

This Court recently refused to subscribe to *Miller's* holding in *United States v. House*, 524 F.2d 1035 (1975). We there expressly ruled that a depositor "has no property interest in the bank's microfilms" of his account. In doing so, we said at page 1044:

"... Any contention that either the fourth or fifth amendment creates for them a privacy interest in the bank's records would seem to have been put to rest by *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), a case to which Judge Goldberg makes no

reference in *Miller.* Certainly it would be difficult, since *Couch*, to imagine on what basis we could hold that the taxpayers, when they made their bank deposits and invoked the bank's assistance in collecting third party negotiable instruments, entered a constitutionally protected zone of privacy."

Other circuits are in accord: *United States v. Continental Bank & Trust Company*, 503 F.2d 45, 49 (10th Cir. 1974); *United States v. Gross*, 416 F.2d 1205, 1213 (8th Cir. 1969); *Harris v. United States*, 413 F.2d 316, 318 (9th Cir. 1969); *Galbraith v. United States*, 387 F.2d 617, 618 (10th Cir. 1968); *O'Donnell v. Sullivan*, 364 F.2d 43, 44 (1st Cir.), *cert. denied*, 385 U.S. 969, 87 S.Ct. 501, 17 L.Ed.2d 433 (1966); *Application of Cole*, 342 F.2d 5, 7 (2d Cir.), *cert. denied*, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965).

The cases cited are in consonance with recent Supreme Court holdings in the general field.

In *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974), it was said at page 53, 94 S.Ct. at page 1513, 39 L.Ed.2d at page 835:

"We decided long ago that an Internal Revenue summons directed to a third-party bank was not a violation of the Fourth Amendment rights of either the bank or the person under investigation by the taxing authorities. See *First National Bank v. United States*, 267 U.S. 576 [45 S.Ct. 231, 69 L.Ed. 796] (1925), aff'g 295 F. 142 (S.D.Ala.1924); *Donaldson v. United States, supra*, [400 U.S. 517 (1971)] at 522 [91 S.Ct. 534 at 538, 27 L.Ed.2d 580 at 584]. '[I]t is difficult to see how the summoning of a third party, and the records of a third party, can violate the rights of the taxpayer, even if a criminal prosecution is contemplated or in progress.' *Id.*, at 537 [91 S.Ct. at 545, 27 L.Ed.2d at 593] (Douglas, J., concurring)." 416 U.S. at 53, 94 S.Ct. at 1513, 39 L.Ed.2d at 835. (emphasis supplied).[29]

---

**28.** "Statement of Issue Presented for Review," Brief of the Appellant.

**29.** In *Donaldson*, it was held that a petitioner seeking intervention in the enforcement of Internal Revenue summonses directed to petition-

In *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), it was held that the defendants had no standing to challenge the admission of evidence seized on the premises of another under a defective search warrant. In so holding, the Court said at page 229, 93 S.Ct. at 1569, 36 L.Ed.2d at 214:

"In deciding this case, therefore, it is sufficient to hold that there is no standing to contest a search and seizure where, as here, the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest *in the premises* ; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure." (emphasis supplied).

In *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973) it was held that a taxpayer "cannot reasonably claim, either for Fourth or Fifth Amendment purposes, an expectation of protected privacy" as to her business records in the possession of her accountant. 409 U.S. at 335–36, 93 S.Ct. at 619, 34 L.Ed.2d at 558.

In *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961 at page 965, 22 L.Ed.2d 176 at page 185 (1969), it was held at pages 171–72, that "suppression of the product of a Fourth Amendment violation can be successfully urged *only* by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." (emphasis supplied).[30]

Applying the principles stated to the instant case, we are of the opinion that the court below did not err in denying for lack of standing, Hilton's pre-trial and trial Fourth Amendment claims with respect to the government's securing of the records maintained by the Keystone Bank relating to the Hilton loans, and the bank's copies of the Oppenheim July 1972 deposit and checks, pursuant to the October 1, 1974 subpoena.

Our holding that Hilton lacks standing to challenge the legality of the October 1, 1974 subpoena makes it unnecessary for us to discuss the substantive content of that challenge.

There remains this to be said with respect to Hilton's contention that even without standing on his part "[t]he doctrine of judicial integrity requires rejection of illegally seized and tainted evidence," under the "exclusionary rule."

■ We are advised by the district court: "[I]t appears that without any prior application to the grand jury, or any attempt to secure its consent, or even any knowledge of the grand jury that it was being done, an Assistant United States Attorney filled out a form of a grand jury subpoena duces tecum, bearing the signature of the Clerk and the seal of the United States District Court, which commanded the party named to produce certain papers 'forthwith' to any agent of the Federal Bureau of Investigation, who was designated therein as the 'agent of the grand jury'."[31] The district court also found that "it is a fair inference that there was no intention of presenting the papers immediately to the grand jury upon their production and, therefore, the

er's former employer for the production of employment records, had no proprietary interest in said records and therefore had no absolute right to intervene in the enforcement proceeding.

**30.** In *United States v. Union National Bank*, 371 F.Supp. 763 (W.D.Pa.1974), *aff'd*, 506 F.2d 1053 (3d Cir. 1974), it was held that taxpayers did not have the right to intervene in a proceeding to enforce an Internal Revenue summons which required production of their records, including signature cards, ledger cards, deposit

slips, microfilm of deposited items, debit and credit memoranda relating to checking accounts, financial statements, savings accounts, loan applications or certificates of deposit accounts. Relying on *Donaldson v. United States, supra*, the district court stated:

"Donaldson is clear to the effect that the records of the bank are not the taxpayer's; nor does he have a proprietary interest of any kind in them." 371 F.Supp. at 768.

**31.** "Memorandum Opinion" December 18, 1974.

argument that a grand jury was in fact sitting is meaningless." [32]

Assuming *arguendo*, that the recited circumstances could afford a basis for a two-pronged contention [33] that (1) the Assistant United States Attorney who issued the subpoena knew or should have known that the grand jury would not be in session to examine "forthwith" the subpoenaed materials; and (2) the use of the grand jury subpoena was an improper substitute for a search warrant issued by an impartial judicial officer, we are of the opinion that Hilton lacks standing to present such contention. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

In *Wong Sun, supra*, it was held that the defendant lacked standing to assert a claim that evidence adduced against him was obtained by federal narcotics agents in a search of a co-defendant's home without a search and seizure warrant.

In so holding, the Court said at page 492, 83 S.Ct. at page 419, 9 L.Ed.2d at page 458:

"The seizure of this heroin invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial."

Our disposition in this respect should not be taken as an indication that we condone the practice utilized by the prosecutor in the proceedings below. We must express grave disquietude with respect to the above discussed aspects of the issuance and "forthwith" production provisions of the subpoena. Justice Brandeis' warning is as meaningful today as it was when first articulated a half century ago: "In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a law-breaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." *Olmstead v. United States*,

277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944, 960 (1928) (Brandeis, J., dissenting).

While this court has recognized that federal grand juries "are for all practical purposes an investigative and prosecutorial arm of the executive branch of government," *In re Grand Jury Proceedings*, 486 F.2d 85, 90 (3d Cir. 1973), the influence of the United States Attorney's office on a federal court's grand jury is not a license to misrepresent.

■ Irrespective of the motivation of the prosecutor, the hard fact is that a misrepresentation was made: the subpoena commanded a forthwith presentation to the grand jury of materials at a time when the United States Attorney's office may or should have known that the grand jury would not be in session to receive the documents forthwith. Under these circumstances, the grand jury subpoena is no substitute for a proper application before a judicial officer for a search warrant. It was this egregious circumvention of Fourth Amendment procedures that probably led the district court, in denying Hilton's suppression motion—solely on the issue of standing—to observe, that "in doing so we do not rid ourselves of a chill at the base of the spine. We are old enough to remember how other democratic constitutional systems were brought to destruction by the use of their own legal processes."

This, too, must be said:

■ In the instant case the grand jury, *prior to October 1, 1974*, learned from Keystone Bank records of the existence and repayment of the Hilton loans and the Oppenheim July 1972 deposit and checks, in response to the July 1974 and September 1974 subpoenas directed to the Keystone Bank, here earlier recited. That being so, the government was not foreclosed from using as evidence at Hilton's trial the Keystone Bank records here involved. *Wong Sun v. United States, supra.*

---

**32.** "Memorandum and Order" January 30, 1975.

**33.** Hilton has in fact not presented such a contention.

566

For the reasons stated the judgment of sentence imposed by the district court will be affirmed.