**UNITED STATES of America, Plaintiff,**

v.

**William Vincent TROPP, a/k/a Bill Tropp, a/k/a Connie Burns, Defendant.**

**No. CR89–104–K.**

United States District Court, D. Wyoming.

Nov. 16, 1989.

Gay V. Woodhouse, Sp. Asst. U.S. Atty. D. Wyo., Cheyenne, Wyo., for plaintiff.

Craig E. Kirkwood and Donald Fritzen, Kirkwood, Copenhaver & Nelson, Colling Plaza, Laramie, Wyo., for defendant Tropp.

ORDER DENYING DEFENDANT'S MOTIONS FOR SUPPRESSION OF EVIDENCE AND RETURN OF PROPERTY (WITH FINDINGS)

KERR, District Judge.

The above-entitled matter having come on regularly for hearing before the Court

on defendant's motions for suppression of evidence and return of property; plaintiff appearing by and through its attorney, Gay V. Woodhouse, Special Assistant United States Attorney for the District of Wyoming; defendant appearing by and through his attorneys, Craig E. Kirkwood and Donald Fritzen; and the Court having heard the arguments of counsel and having fully and carefully reviewed and considered the motions and all matters pertinent thereto, and being fully advised in the premises, FINDS:

On September 22, 1989, defendant William Vincent Tropp, a/k/a Bill Tropp, a/k/a Connie Burns was indicted by a federal grand jury on fourteen counts of mail and wire fraud related to fraudulent land sales in violation of 18 U.S.C. §§ 1341, 1343. Defendant seeks suppression of evidence and property seized, claiming that subpoenas for various documents were issued without the presence of a grand jury or other supervisory authority and that a subsequent search warrant was not in conformity with Fourth Amendment standards because of a claimed lack of particularity as to items to be seized. Before turning to a consideration of defendant's claims, the Court, drawing from the indictment, sets forth the substance of the allegations against Tropp.

In conjunction with forming W.V.T. Service, Inc. and listing himself as president, secretary, treasurer, and director, Tropp devised an elaborate scheme and artifice in a number of states designed to defraud and obtain money and property from innocent persons through false and fraudulent pretenses, representations, and promises, knowing them to be so. Tropp offered for sale, in 40–acre parcels, some 11,542 acres of desert lands—lands to which he had no legal or equitable title—located in Sweetwater County, Wyoming. Projected to yield a profit potential in the neighborhood of some $2,000,000, the plan was to ensnare as many unsuspecting persons as possible through mail and wire communications representing said lands as ideal for real estate investments because of their accessibility, roads, wildlife, topography, vegetation, water, existing development as well as potential for development, and the ownership interest of W.V.T. and Tropp. The selling price for each 40–acre parcel was $6,990.

In furtherance of the plan, Tropp obtained a California phone number under an alias; opened checking accounts in at least three cities, to-wit: Malibu, California, Las Vegas, Nevada, and Rawlins, Wyoming; rented a mail drop box in several business names: William V. Tropp, Realvest Inc., D.T. Service, Inc., Pacific Service Corp., and Sierra Construction; and leased residential space with a mailing address in Santa Monica,[1] California as offices for W.V.T.

As an example of the manner of his operation, Tropp placed this advertisement in the September 1988 issue of the magazine *Outdoor Life:* "WYOMING RANCH LAND, 160 ACRES, Rolling Grasslands, Good Water, Abounds With Antelope, Wild Horses, Etc. Near Rawlins. $220.00 Down, $220.00 Monthly ..." and then gave the California phone number for more information.[2] People would then call the number and get a lengthy recorded message. Interested individuals would then receive, by mail, a packet of information which included photographs purporting to depict the ranch land (Jawbone Ranch). Also contained in the packet was a copy of a Rand McNally map of Wyoming with one significant alteration—the label for the Red Desert, the actual land being sold, was edited out. These packets were sent across the country to those who had called the California number, to places such as Granbury, Texas and Ramona, California. In a four-month period ending December 31, 1988, some 100 persons had executed purchase and sale agreements for Jawbone Ranch land.

---

1. The actual address Tropp gave turned out to be in Los Angeles.

2. Advertisements were placed in other journals, including a similar one in a Wyoming trader's journal in early 1989, this time leaving out any reference to towns and reducing the down payment and rentals. The same California number was given.

It appears that significant inroads into Wyoming were not made until January 4, 1989, when W.V.T. reached an agreement with Sun Land & Cattle Co., a Wyoming corporation, for 11,542 acres of real property known as Jawbone Ranch, with a proviso for retention of all payments received and possession of the land by W.V.T. in the event of default. After the warranty deed had been placed in escrow, Tropp caused copies of the deed, but with knowing omissions of material facts therefrom, to be sent to prospective purchasers.

Some three weeks later, a couple in Cheyenne, Wyoming signed an agreement to purchase forty acres of the same land (already sold) after responding to an advertisement and receiving a packet complete with photographs and a fact statement portraying the lands as fertile and abounding with coyotes, bobcats, red fox, ducks, geese sage hens, buffalo, and, yes, even wild horses. The Cheyenne family mailed a rental payment of $76 each month for several months, each time receiving a payment record card in advance of the payment.

Things began to fall apart in mid–1989, prompting Tropp to mail letters to all the purchasers of Jawbone Ranch land explaining that some of the photos contained in their packets were not of the actual ranch lands but, rather, of lands an hour's drive away. Then, on August 22, 1989, purchasers received the following letter from Tropp:

> '[T]he land ... which you own is being investigated by officials in Wyoming. As we mentioned there is nothing for you to worry about.... If for some reason you are contacted we want you to please cooperate as best you can. Also we want you to know that any representations made to you about your land we stand behind 100% and if you are contacted and something does not sound right we will be most happy to supply you with all the written documentation....'

Upon application of the United States Attorney for the District of Wyoming, six grand jury subpoenas for financial records pertinent to Tropp's alleged scheme were issued between June 26, 1989 and September 7, 1989. On August 17, 1989, a search warrant for the California offices of W.V.T. was issued by a magistrate for the United States District Court for the Central District of California.

Defendant now maintains that the aforementioned subpoenas were defective for the reason that the grand jury was not in session at the time subpoenas were sought, consequently resulting in their issuance without any supervisory authority. Because the grand jury did not view the documents seized pursuant to these subpoenas until its next session in September 1989, condoning this practice amounts to an abuse of the grand jury system insists Tropp. As for the search warrant, claims of deficiency in particularity are made. Tropp charges that the warrant left virtually unbridled discretion with the agents as to what items fell within its ambit. The major complaint here seems to be directed toward records of Realvest which were seized during the operation. These so-viewed "improprieties," when judged in the light of the commands of the Constitution, merit suppression of the items seized.

The United States counters that the subpoenas were obtained as part of the grand jury process notwithstanding the absence of a sitting grand jury at the time. Furthermore, the Government finds no defect with the language or scope of the search warrant or, for that matter, the initial probable cause determination, pointing to the good faith efforts of the postal inspector and the securities investigator to carefully sift through the papers and seize only those papers relating to Wyoming transactions.

■■■ A presumption of regularity attaches to a grand jury subpoena, a presumption which those challenging the propriety of the circumstances of a subpoena's issuance must overcome through some showing of irregularity before a court will quash the subpoena or, in this case, suppress the evidence obtained thereunder and order the property returned. *See First National Bank of Tulsa v. U.S. Department of Justice*, 865 F.2d 217, 219 (10th Cir.1989). The authority of a grand jury to

probe violations of criminal law through the use of subpoenas duces tecum is very broad, circumscribed only by the requirements that the evidence to be produced cover a reasonable period of time, that it be relevant to the investigation, and that it be identified with reasonable particularity.[3] *See, e.g., United States v. Reno,* 522 F.2d 572, 575 (10th Cir.1975) and *United States v. Gurule,* 437 F.2d 239, 241 (10th Cir. 1970), *cert. denied,* 403 U.S. 904, 91 S.Ct. 2202, 29 L.Ed.2d 679 (1971).

Tropp challenges the issuance of six subpoenas by the United States Attorney himself without a sitting grand jury or without a judicial officer as an abuse of the grand jury process. Such nonsupervision, argues Tropp, renders any subsequent search and seizure unreasonable, providing sufficient grounds for suppression of documents seized. Alternatively, Tropp argues that suppression is warranted since he never received notice of or a copy of the subpoenas as required under the Right to Financial Privacy Act of 1978, 12 U.S.C. §§ 3401 et seq. The Court takes up each argument in turn.

■ The United States Attorney is given considerable leeway in preparing for a grand jury investigation. *First National Bank of Tulsa,* 865 F.2d at 219. Consequently, it is commonplace for a United States Attorney to obtain a blank grand jury subpoena and fill it out without actual prior grand jury authorization. *See, e.g., id.* at 220; *United States v. Santucci,* 674 F.2d 624, 627–631 (7th Cir.1982), *cert. denied,* 459 U.S. 1109, 103 S.Ct. 737, 74 L.Ed.2d 959 (1983). Indeed, the same may be done without the knowledge of the grand jury. *First National Bank of Tulsa,* 865 F.2d at 220. The question which now presents itself is whether, in this instance, the practice constituted an abuse of the grand jury system. To resolve this question, inquiry must be made into wheth-er the subpoenas were issued "in furtherance of an actual grand jury investigation, i.e., to secure a presently contemplated presentation of evidence before the grand jury." *United States v. Walasek,* 527 F.2d 676, 678 (3rd Cir.1975).

The grand jury in this district convenes every other month. For example, this year a grand jury met May 16–19, July 18–20, and September 18–22. Three subpoenas were issued on June 26, 1989; one was issued on August 30, 1989; and two were issued on September 7, 1989. Thus, each of them were issued between sessions of the grand jury. However, in each instance, the return date (September 22, 1989) was for a date when the grand jury was in session. These circumstances have been held sufficient to withstand challenges to the indictment or to the evidence obtained. *See United States v. Kleen Laundry & Cleaners, Inc.,* 381 F.Supp. 519 (E.D.N.Y. 1974). Defendant's arguments directed toward the lack of supervisory authority over the issuance of a subpoena, without more, are simply deficient to overcome the presumptions of regularity.

■ Likewise, defendant's fears that the subpoenas served as an improper substitute for a search warrant are for naught. Had the United States Attorney issued subpoenas commanding "forthwith" presentation of materials to a grand jury at a time when his office should have known that the grand jury would not be in session to receive the materials forthwith, defendant's fears could not so easily be discounted. *See United States v. Hilton,* 534 F.2d 556 (3rd Cir.1976), *cert. denied,* 429 U.S. 828, 97 S.Ct. 86, 50 L.Ed.2d 91 (1976).

■ All grand jury subpoenas issued by the United States Attorney were directed to various banks and sought all financial records relating to defendant and W.V.T. Service, Inc. Unlike the case in *In re Sub-*

---

**3.** Use of phrases such as "related to" and "associated with" in a grand jury subpoena are not fatal. *Cf. In re Sealed Case,* 832 F.2d 1268, 1282–1283 (D.C.Cir.1987) (subpoena requiring production of documents of foreign companies for investigation of possible violations of United States law by persons secretly selling arms to Iran and providing military support to the Nicaraguan Contras was not overly broad or imprecise where it used phrases such as "related to" and "associated with" in view of the importance and comprehensiveness of the Independent Counsel's charge).

poena To Testify Before Grand Jury Numbered S286-4-7, 630 F.Supp. 235 (N.D.Ind.1986), the subpoenas sought production not of all financial records regardless of topic but rather the records which dealt with specific subject matter. Without question, the materials sought were in furtherance of securing evidence to be brought before a grand jury for a criminal investigation and so were relevant. The time period involved, apparently some 21 months, was not unreasonable.

■ Tropp's remaining argument centering around § 3405(2) of the Right to Financial Privacy Act of 1978, which requires, in part, that the Government serve a copy of an administrative subpoena upon the customer of a financial institution on or before the date the same is served upon the institution is inapplicable in the context of grand jury subpoenas. See 12 U.S.C. § 3413(i). Thus, suppression based on the grand jury subpoenas is inappropriate as there was no abuse of the grand jury process.

This leaves Tropp's allegations regarding the search of the offices of W.V.T. pursuant to a search warrant. Tropp contends that the affidavit which formed the basis for the warrant failed to disclose facts establishing the source of the information alleged therein and, further, that the warrant failed to describe the property to be seized with sufficient particularity—all in violation of the Fourth Amendment. Primarily, Tropp argues that any property seized which does not pertain to W.V.T. exceeds the scope of the warrant. In particular, Tropp seeks the return of all documents associated with Realvest, Inc.

■ The Fourth Amendment prohibits an unreasonable search undertaken without a warrant. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Shaffer v. Wilson, 523 F.2d 175, 179 (10th Cir.

1975), cert. denied, 427 U.S. 912, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). Before a search warrant will issue, probable cause, typically via affidavit, for its issuance must be brought before a magistrate. Aguilar v. Texas, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964). Probable cause cannot be established by affidavits which are conclusory, provide little in the way of detail, or merely recite that the affiant or some informant believes that probable cause exists. Edmondson v. United States, 402 F.2d 809, 812 (10th Cir. 1968). The affiant in this case, a postal inspector, Kent I. Powell, submitted a 29-page affidavit which suffers from no bald recitations or simple conclusory statements; rather, it gives sufficient facts, including names and dates, from which a magistrate could find probable cause.[4]

■ The search warrant was for "[b]usiness records and sales records for W.V.T. Service, Inc. operated by William Vincent Tropp, a/k/a Bill Tropp, in regard to the marketing and sale of land located in the State of Wyoming ..." and stated that the evidence sought "involves business transactions, direct and indirect, between W.V.T. Service, Inc., William Vincent Tropp, a/k/a Bill Tropp, and various individuals, companies, newspapers, government agencies and places, including but not limited to the following ..." and then proceeded to enumerate the same. This language is specific and, while it may involve many documents, is sufficiently particular as to the matters sought, namely any evidence involving sales of land in Wyoming.

■ At the suppression hearing, Inspector Powell testified that he directed the search of the offices of W.V.T. Powell and another agent each spent some five hours sifting through a plethora of documents after having videotaped the premises. Some evidence not pertinent to the warrant was seized, as Powell freely admitted, only

---

**4.** This is in stark contrast to the following scantily drawn affidavit which, in its relevant portions, the Supreme Court found to be insufficient to establish probable cause in Aguilar:

'Affiants have received reliable information from a credible person and do believe that heroin, marijuana, barbiturates and other narcotics and narcotic paraphernalia are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law.'

Aguilar, 378 U.S. at 109, 84 S.Ct. at 1511 (footnote omitted).

because it had been commingled or misfiled with relevant documents. That evidence was returned. As for any Realvest documents seized, suffice it to say that Realvest Inc. was owned by Tropp and it too was involved in the sale of Wyoming land to some extent and so came within the ambit of the search warrant.

In sum, the search warrant comported with the mandate of the Fourth Amendment and the search conducted pursuant thereto was not unreasonable. The meticulous nature with which the agents undertook their task, rather than conveying an image of discretion run rampant, shows a concerted good faith effort to seize only those items called for by the language of the search warrant, language which was reasonably specific. As defendant is unable to meet his burden as to either the grand jury subpoenas or the search warrant, the mode of disposition is clear.

NOW, THEREFORE, IT IS ORDERED that defendant's motions for suppression of evidence and return of property be, and the same are, hereby denied.