**AMERICAN ELECTRIC POWER COMPANY, INC., et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. Civ.A. C–2–99–724.

United States District Court, S.D. Ohio, Eastern Division.

Dec. 17, 1999.

James W. Johnson, Steptoe & Johnson, Washington, DC, for plaintiffs.

D. Patrick Mullarkey, Alex Sadler, U.S. Department of Justice, Tax Division, Washington, DC, for defendant.

James A. Bruton, III, Williams & Connolly, Washington, DC, for Newport Group Inc.

Michael I. Saltzman, Lawrence M. Hill, White & Case, New York City, for CM Holdings Inc.

## ORDER

ABEL, United States Magistrate Judge.

American Electric Power, Inc. and its subsidiaries ("AEP") bring this action under 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422 against the United States of America ("Government") to recover federal income tax overpayments. AEP alleges that it is entitled to claim a deduction for interest on accrued loans secured by corporate-owned life insurance ("COLI") policies. AEP is seeking a refund of more than $300 million in corporate income taxes and interest.

This matter is before the Magistrate Judge on the Government's May 10, 1999 motion to compel the Newport Group ("Newport") to comply with a subpoena *duces tecum* issued by the Government on January 20, 1999 (doc. 2) and AEP's October 1, 1999 motion for leave to file a response to the Government's reply memorandum (doc. 26). The subpoena at issue contained eleven requests for documents. The Government and Newport have reached an agreement with regard to most of the document requests, but Newport objects to Request Nos. 6, 7, and 8 on the grounds that they call for the production of documents irrelevant to the issues in this action and that they are unlikely to lead to the

discovery of relevant evidence. In addition, Newport has provided the Government documents responsive to Request No. 2, but it has redacted the name and identifying information of the client referenced in the documents.

The Government contends that Request Nos. 6, 7, and 8 ask for documents that are relevant to the issue of whether the COLI policy loans made to AEP had economic substance. With regard to Request No. 2, the Government argues that the client's identity is not privileged or beyond the scope of discovery and that the client's identity would be adequately protected by the confidentiality agreement that Newport and the Government have executed. The Government also argues that Newport waived its objections to the subpoena because it failed to serve written objections within 14 days after service of the subpoena. For the reasons that follow, both motions are granted.

### I. Facts

The complaint alleges that AEP is entitled to claim a deduction for interest on accrued loans secured by corporate-owned life insurance ("COLI") policies. COLI is a type of life insurance purchased by companies on the lives of their employees. Unlike traditional life insurance, the company, not the employee, owns the policy and receives the proceeds from the policy when the insured employee dies.

In 1990, AEP purchased COLI policies on the lives of approximately 20,848 of its employees. The COLI policies were issued by Mutual Benefit Life Insurance Company ("Mutual Benefit"), and Mutual Benefit reinsured these policies with Hartford Life Insurance Company ("Hartford Life"). AEP's total annual COLI premiums were approximately $345 million. A portion of these premiums were paid with cash, but most of the premiums were paid through various financing mechanisms built into the policies, such as designated policy loans, policyholder dividends, and withdrawals of policy value.

AEP claimed deductions for the interest charges on the policy loans on its federal corporate income tax returns for taxable years 1990 through 1996. In an audit of AEP's income tax returns, the Internal Revenue Service ("IRS") disallowed the COLI policy loan deductions. The IRS determined that the interest charges claimed by AEP did not represent "interest paid or accrued ... on indebtedness" within the meaning of § 163(a) of the Internal Revenue Code. In other words, the IRS concluded that the policy loans did not reflect actual indebtedness from AEP to the insurance carriers (Mutual Benefit and Hartford Life) and that the amounts denominated as "interest" did not constitute compensation for the forbearance of money. Rather, the IRS found that the policy loans, interest payments, and other aspects of AEP's COLI policies were "paper transactions" devoid of economic substance aside from the tax savings they were designed to generate. After paying the taxes due once the interest deductions were disallowed, AEP proceeded to file this action.[1]

Newport, a non-party to this action, is a Florida corporation having its offices and principal place of business in Heathrow, Florida. It is engaged in the business of designing and implementing insurance programs and brokering insurance plans, both for corporate clients and individuals. It also administers the insurance plans after the plans are purchased. Newport was the agent on the sales of the COLI policies at issue. Newport received commissions from Mutual Benefit for its efforts in placing insurance policies with AEP and other companies, and it received fees from AEP and other companies for administering their plans.

According to Newport, it has received four discovery subpoenas from the Government and thirteen IRS information document requests relating to AEP and C.M. Holdings, Inc. ("Camelot"). Also, during the last three years, Newport has responded to approximately 110 IRS document requests seeking over 100,000 documents relating to approxi-

---

1. A similar lawsuit is pending in the United States District Court for the District of Delaware, *Internal Revenue Service v. C.M. Holdings, Inc.,* Case No. 97–695 (D.Del.). This lawsuit is referred to as the *"Camelot* case."

mately thirty other clients who purchased COLI policies from it. Further, during the period January 13, 1999 through January 15, 1999, four Newport employees were deposed in Atlanta in connection with this action and the *Camelot* case.

The first subpoena requesting documents from Newport was issued by the Government on May 1, 1998 in the *Camelot* case. Because the case was removed from the bankruptcy court to the district court, the Government reissued the subpoena on June 24, 1998. Newport objected to the subpoena on the ground that certain document requests called for irrelevant information, trade secrets, and proprietary information. Newport subsequently responded to the subpoena after the Government consented to the entry of a stipulated protective order maintaining the confidentiality and preventing dissemination of the trade secrets and proprietary information.

The Government issued a second subpoena on October 23, 1998 and issued a third subpoena on December 23, 1998. Because the Government served counsel for Newport instead of a Newport officer or agent authorized to accept service, the Government reissued the December 23, 1998 subpoena on January 6, 1999. In a letter dated November 5, 1998, Newport objected to the October 23 subpoena because it maintained that most of the requested documents had previously been produced to the IRS during the examination and administrative review that led to this litigation. In a letter dated January 15, 1999, Newport objected to portions of the January 6 subpoena.

The fourth subpoena, which is the one at issue, was issued by the Government on January 20, 1999. On February 9, 1999, counsel for Newport forwarded a waiver of service form executed by Newport's general counsel for this subpoena. In a letter dated March 1, 1999, Newport responded to the January 20 subpoena. Newport objected to Request Nos. 6, 7, 8, and 11, and it notified the Government that its staff was working to locate and provide copies of documents responsive to the other requests. Newport offered to produce documents responsive to Request No. 6 if the Government abandoned Request Nos. 7 and 8. Newport later offered to supply the Government with summaries of the annual net income or loss relating to the "risk-sharing and obligations" agreements referred to in Request Nos. 6, 7, and 8.

On May 10, 1999, the Government filed a motion to compel Newport to comply with the January 20 subpoena in the United States District Court for the Middle District of Florida. On July 26, 1999, the motion to compel was referred to this Court for consideration. The motion to compel is now fully briefed and ripe for decision.

## II. Discussion

### A. Standard of review

The scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad. *See Lewis v. ACB Business Services, Inc.,* 135 F.3d 389, 402 (6th Cir.1998). Rule 26(b) authorizes parties to obtain "discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action," and all information "reasonably calculated to lead to discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). "The scope of examination permitted under Rule 26(b) is broader than that permitted at trial. The test is whether the line of interrogation is reasonably calculated to lead to the discovery of admissible evidence." *Lewis,* 135 F.3d at 402 (quoting *Mellon v. Cooper-Jarrett, Inc.,* 424 F.2d 499, 501 (6th Cir. 1970)).

Rule 45 provides in pertinent part:

[A] person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued.

Fed.R.Civ.P. 45(c)(2)(B). Rule 45 further provides that "the court by which a subpoena was issued shall quash or modify the subpoena if it ... subjects a person to undue burden." Fed.R.Civ.P. 45(c)(3)(A)(iv).

■ Whether a subpoena imposes an "undue burden" upon a witness is a case specific inquiry that turns on "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 53 (S.D.N.Y.1996) (quoting *United States v. Int'l Bus. Mach. Corp.*, 83 F.R.D. 97, 104 (S.D.N.Y.1979)). Courts are required to balance the need for discovery against the burden imposed on the person ordered to produce documents, and the status of a person as a non-party is a factor that weighs against disclosure. *See Katz v. Batavia Marine & Sporting Supplies*, 984 F.2d 422, 424 (Fed. Cir.1993); *Echostar Communications Corp. v. The News Corporation Ltd.*, 180 F.R.D. 391, 394 (D.Colo.1998); *see also Concord Boat*, 169 F.R.D. at 49; Fed.R.Civ.P. 45(c)(2)(B). Demonstrating relevance is the burden of the party seeking discovery. *See Katz*, 984 F.2d at 424–25; *Echostar Communications*, 180 F.R.D. at 394; *Compaq Computer Corp. v. Packard Bell Electronics, Inc.*, 163 F.R.D. 329, 335 (N.D.Cal.1995).

## B. Whether Newport timely served written objections to the subpoena

The Government first argues that Newport waived its objections to the January 20 subpoena because it failed to serve written objections "within 14 days after service of the subpoena," as required by Rule 45. The Government maintains that Newport did not serve its objections, or otherwise contact it regarding the subpoena, until March 1. The Government further maintains that Newport's failure to comply with the time limitations in Rule 45 has prejudiced it because it expected to receive the requested documents by mid-February, well before the April 15, 1999 deadline for the exchange of the parties' expert reports. Accordingly, the Govern-

ment contends that Newport's objections should not be considered.

Newport responds that its failure to act timely should not bar consideration of its objections. First, Newport notes that it has had repeated contacts with the Government concerning its production of documents for the last three years, having responded to 110 IRS document requests and having supplied documents for three other discovery subpoenas. Indeed, when Newport received the January 20 subpoena, it was still attempting to respond to the documents requested in the January 6 subpoena and counsel for Newport and the Government were still discussing Newport's objections to the January 6 subpoena. Second, Newport states that the Government has been notified repeatedly that, with only 40 employees, it has only a small staff available to search for documents and respond to subpoenas and similar requests. Accordingly, it maintains that the Government could not have legitimately expected to receive the documents requested in the January 20 subpoena by mid-February because the Government knew that Newport's staff was still searching in February for documents responsive to the January 6 subpoena. Third, Newport contends that the January 20 subpoena is overbroad on its face. Fourth, Newport argues that the January 20 subpoena did not comply with the Court's July 2, 1998 preliminary pretrial order because it contends that the Government was required under the order to demonstrate how the requested documents were relevant to the issues in this action before issuing the subpoena.

■ The failure to serve written objections to a subpoena within the time specified by Rule 45 typically constitutes a waiver of such objections. *See Concord Boat*, 169 F.R.D. at 48; *Angell v. Shawmut Bank Connecticut Nat'l Assoc.*, 153 F.R.D. 585, 590 (M.D.N.C.1994). "In unusual circumstances and for good cause, however, the failure to act timely will not bar consideration of objections." *Concord Boat*, 169 F.R.D. at 48 (citations omitted). Courts have found unusual circumstances where: (1) the subpoena is overbroad on its face and exceeds the bounds of fair discovery; (2) the subpoenaed witness

is a non-party acting in good faith; and (3) counsel for the witness and counsel for the subpoenaing party were in contact concerning the witness' compliance prior to the time the witness challenged the legal basis for the subpoena. *Id.* (citations omitted).

■ Although Newport's status as a non-party does not relieve it of its obligations to respond to proper discovery requests or to comply with the applicable rules, it does entitle Newport to consideration regarding expense and inconvenience. *See Semtek Int'l, Inc. v. Merkuriy Ltd.*, No. 3607 DRH, 1996 WL 238538, at *2 (N.D.N.Y. May 1, 1996); Fed.R.Civ.P. 45(c)(2)(B). When it received the January 20 subpoena, Newport was still searching for documents responsive to the January 6 subpoena, and it had already produced over 100,000 documents responding to 110 IRS document requests and two previous subpoenas issued by the Government. Moreover, the Government knew that Newport had only a small staff available to respond to the document requests and that it was having difficulty finding the requested documents within the time allotted by the Government. Although counsel for Newport and the Government did not discuss Newport's objections to the January 20 subpoena prior to March 1, Newport had made similar objections to the first three subpoenas and counsel had discussed these objections. Also, counsel for Newport repeatedly expressed Newport's concern that the Government was requesting documents it had already provided, and counsel notified the Government that the document requests were taking hundreds of man-hours to complete.[2]

In the absence of any showing of intentional failure or bad faith by Newport, Newport's status as a non-party, its overall cooperation with the Government's discovery efforts, its extensive production of documents during the IRS's administrative review and this litigation, and the ongoing communication between counsel for Newport and counsel for the Government concerning Newport's objections to the Government's repeated document requests are all factors weighing in favor of

finding that a strict application of Rule 45(c)(2)(B) appears unjustified. *See Semtek Int'l*, 1996 WL 238538, at *2; *see also Concord Boat*, 169 F.R.D. at 52; *In re Goodyear Tire & Rubber Co. Securities Litigation*, No. 1:89–0894X, 1991 WL 172930, at *1 (N.D.Ohio June 21, 1991). Accordingly, the Magistrate Judge concludes that Newport has not waived its right to object to the January 20 subpoena.

## C. Whether Request Nos. 6, 7, and 8 are relevant to the claims and defenses of the parties to this action

Having found that Newport has not waived its objections to the January 20 subpoena, the Magistrate Judge will now consider Newport's objections to Request Nos. 6, 7, and 8. These requests are as follows:

REQUEST NO. 6: All risk-sharing contracts entered into between Newport and Hudson Life Insurance Company or any successor reinsurance company regarding MBL/Hartford COLI products between 1989 and 1996.

REQUEST NO. 7: Any documents that would reflect the amounts of gross income received by Newport for the years 1989 throught [sic] 1996 under any risk-sharing contracts entered into between Newport and Hudson Life Insurance Company or any successor reinsurance company regarding MBL/Hartford COLI products.

REQUEST NO. 8: All correspondence and memoranda relating or referring to risk-sharing contracts or arrangements entered into between Newport and Hudson Life Insurance Company and any sucessor [sic] reinsurance company regarding MBL/Hartford COLI products between 1989 and 1996.

(Government's Mot. to Compel, doc. 2, Ex. C.)

Newport contends that these requests call for the production of documents irrelevant to the issues before the Court and unlikely to lead to the discovery of relevant evidence. The Government responds that the docu-

---

**2.** See Appendix to Newport's Opposition to Motion to Compel Discovery, doc. 8, Exs. 1, 8, 15; Bruton Aff., doc. 9, ¶¶ 7, 10.

ments concerning the "risk-sharing and obligations" agreements that Newport entered into with COLI reinsurers are relevant to the issue of whether the policy loans made to AEP have economic substance, *i.e.*, whether the policy loans were bona fide transactions reflecting AEP's receipt of money in exchange for the payment of interest or whether they were "tax-driven sham transactions." The Government maintains that it is critical to trace all cash flows that went into and came out of the COLI policies, differentiate actual cash payments from "paper" payments in which no cash changed hands, determine what insurance benefits were actually provided in exchange for the actual cash payments, and understand who shared in the tax-driven profits generated by the COLI policies and to what services those profits were attributable. To perform this analysis, the Government states that it must obtain a complete showing of the profits and expenses generated by the COLI policies, including any payments made to Newport under the "risk-sharing and obligations" agreements described by Newport president James Campisi at his deposition.[3]

The Government explains that it has retained several economic experts, including Dr. James W. Hoag, to analyze the economic and financial dynamics of the Mutual Benefit/Hartford Life COLI policies at issue. In performing their analysis, the experts have attempted to trace the money that went into AEP's COLI policies as well as the insurer's allocation of that money toward expenses and profits, including the compensation paid to Newport, either directly or indirectly, for the brokerage and administration services it provided and possibly as a return on its investment in the COLI policies.[4] The Government states that it has already received documents showing the amounts Newport received as commissions and administrative fees, but it has not received any documents showing the "profits" that Newport earned as a result of the "risk-sharing and obligations" agreements. The requested documents will show the profits Newport earned and will assist the Government in analyzing the economic substance of the COLI transactions.[5]

The Government also contends that the requested documents would be relevant to Campisi's credibility if he testifies at trial on behalf of AEP. Because the reinsurance agreements would show the financial interest Campisi has in the outcome of this case, the documents would be relevant to the assessment of Campisi's credibility.

Newport argues that its compensation is irrelevant to the claims and defenses of the parties in this case. Although Newport acknowledges that it has provided documents concerning its commissions and fees, Newport points out that it initially objected to the production of these documents on the grounds of relevance. Newport turned over the documents, under a stipulated protective

---

**3.** On January 13–15, 1999, the Government deposed Campisi and three other Newport employees regarding Newport's involvement with the Mutual Benefit COLI policies. In or around 1989, Newport's principals entered into what Campisi described as a "risk-sharing and obligations" agreement with insurance companies that were "reinsuring" the Mutual Benefit/Hartford Life COLI policies (*i.e.*, sharing in the risks and profits associated with the product). According to a senior vice president at Mutual Benefit, Mutual Benefit agreed to allow Newport to share in its COLI profits in order to promote more COLI business from Newport. The Government states that the terms and characteristics of this agreement, which are the subject of the document requests at issue, are unknown to it.

**4.** During his deposition, Campisi testified that Newport received commissions from Mutual Benefit and Hartford Life in exchange for its brokerage services and that Newport received fees from AEP for what it characterized as administrative services provided to AEP after the COLI policies were issued.

**5.** In his affidavit, Dr. Hoag states that he has prepared expert reports in this case and the *Camelot* case that "analyze details from each of the transactions that form the basis of these cases." (Government's Mot. to Compel, doc. 2, Ex. F, ¶ 6.) "In each report, [he] cited the need for analysis of additional third party documents that were forthcoming (from The Newport Group, among others)." (*Id.*) Dr. Hoag further states that "[i]nformation (including the documents requested in the subpoena issued to The Newport Group) regarding any payments received by Newport Group and its affiliates bears directly on [his] analysis, [his] expert opinion and the financial and economic substance of the corporate-owned life insurance in these transactions." (*Id.*, ¶ 9.)

order, at the request of counsel for AEP that discovery not be delayed. Newport, however, has never conceded that its compensation bears any relation to the interest deductions claimed by policy holders on their tax returns, and Newport disputes the idea that a financial investment in a risk-sharing agreement could even be characterized as compensation. Newport also notes that the Government's economic expert, Dr. Hoag, has already submitted an expert report in which he does not mention "reinsurance" or "risk-sharing agreements" or Newport's compensation.

Newport also argues that the Government's motion should be denied because the Government failed to comply with the Court's July 2, 1998 preliminary pretrial order. Newport contends that under the July 2, 1998 preliminary pretrial order, the Government was required to meet the preliminary burden of "[i]dentify[ing] each document (or category of document) sought" and "explain[ing] the potential relevance of the document to the claims/defenses in this lawsuit" prior to engaging in any third-party discovery. *See* Case No. 98–304, Preliminary Pretrial Order, doc. 13, p. 8. Newport further argues that under the preliminary pretrial order, the Government was obligated to demonstrate that "the burden or expense of the proposed discovery does not outweigh its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, and the importance of the proposed discovery in resolving the issues." *Id.* at 9. In response to this argument, the Government states that after the preliminary pretrial conference, it reached an agreement with AEP on the scope of discovery and filed an agreed case management plan. Under the case management plan, the Government maintains that it was authorized to serve document subpoenas on third parties without obtaining the Court's approval.

At the Court's request, AEP and Camelot have submitted memoranda addressing the Government's motion. With regard to Request Nos. 6, 7, and 8, Camelot contends that "[a]ny income Newport may have derived from its reinsurance agreement has no relevance to whether Camelot may claim interest deductions from policy loans taken against it[s] COLI policies." (Camelot Mem., doc. 12, p. 5.) Camelot also states that in the *Camelot* case, the Government has retained six experts who have submitted expert reports and rebuttal reports. Although these reports contain analyses and opinions regarding the COLI policies purchased by Camelot, none of the reports discuss Newport's reinsurance agreements or opine that the existence of a reinsurance agreement invalidates Camelot's COLI interest deductions.

AEP also contends that the requested documents are irrelevant to the claims and defenses of the parties in this action. AEP first states that during IRS' three-year audit of the COLI interest deductions, the Government never gave any indication that the requested documents were relevant and never sought such information. Likewise, the Government has submitted six expert reports that analyze the COLI insurance transaction and reach definitive and unqualified opinions, but none of these reports mentions reinsurance agreements or indicates that information about such agreements may be relevant. AEP next states that the Government has refused to respond to interrogatories focusing on the accounting treatment accorded by Hartford Life to AEP's insurance policies because, in its view, Hartford Life's accounting treatment was not at issue and therefore was not relevant. "Given this, the [G]overnment has no basis to argue that information regarding a *subsequent* reinsurance agreement from Hartford Life to another reinsurer is relevant. Indeed, Hartford Life had several other reinsurance arrangements in place with other reinsurers, and the [G]overnment has sought no information about any of them." (AEP Mem., doc. 13, pp. 2–3) (emphasis in original). AEP also maintains that the Government has indicated that it is "attacking" all COLI policies issued by Mutual Benefit, whether or not those policies were sold or administered by Newport, and that it is "attacking" COLI policies issued by other life insurance companies, whether or not any reinsurance exists. Such a far-ranging "attack" on COLI policies shows that information concerning Newport's dealings with a reinsurer bears no relation to the

validity of policy loans taken in conjunction with the COLI policies or the validity of premiums paid with those policy loans.

■ The Magistrate Judge finds that the document requests were not overbroad and that the Government has met its burden of showing that the requested documents are relevant to the claims and defenses of the parties in this action. In arguing that the interest charges claimed by COLI policyholders do not represent "interest paid or accrued . . . on indebtedness," the Government has focused not only on whether there was a legitimate business purpose for acquiring the underlying insurance, but it has also examined the financing arrangements of the insurance policies to see whether the underlying loan transactions are shams without economic substance. *See, e.g., In re C.M. Holdings, Inc.,* 221 B.R. 715, 717–18 (D.Del.1998); *Winn–Dixie Stores, Inc. v. Commissioner,* 113 T.C. No. 21, 1999 WL 907566 (1999). In this case, the Government contends that in order to create value in the COLI policies (against which policy loans could be taken) and to return funds to AEP in the form of dividends, the premiums charged AEP were artificially inflated by contractual "loading charges" that were in excess of the anticipated costs. Among the anticipated costs were Newport's commissions and administrative fees and Newport's "profits" from the "risk-sharing and obligations" agreements. By learning how the "risk-sharing and obligations" agreements were structured and what monies were received pursuant to those agreements, the Government expects that it will be able to trace the cash payments that went into AEP's COLI policies and the allocation of this cash to the insurer's profits and expenses. This analysis of the cash flow will allow the Government to determine what insurance benefits were actually provided in exchange for the cash payments and what portion of the premiums were actually paid to the insurer as consideration for its risk that the insured might die during the covered period.

Balancing the relevance of the requested documents, the Government's need for these documents, and the burden imposed on Newport, the Magistrate Judge concludes that the Government is entitled to the documents requested in Request Nos. 6, 7, and 8.

## D. Whether Newport must produce documents responsive to Request No. 2 in unredacted form

Request No. 2 asks for "[a]ll sales illustrations on any medium (including computer disks and other electronic files) generated by IAS and/or reformatted by Newport from 1983 to 1996 for any prospective Newport client showing or reflecting the financial performance of a MBL/Hartford COLI plan where the prospective policyholder would fully pay the premium in the first three policy years without borrowing through policy loans." (Government's Mot. to Compel, doc. 2, Ex. C.) In response to this request, Newport located one document from which it redacted the name and identifying information of the prospective policyholder. Newport concedes that the fact it provided a full-pay illustration to a corporation considering the purchase of COLI policies is relevant to the issues in this action. Newport argues, however, that the name and identifying information of a client who is not a party to either this case or the *Camelot* case is not relevant.

The Government explains that Newport used sales illustrations in marketing the Mutual Benefit/Hartford Life COLI policies to demonstrate the projected cash flows and earnings that the COLI policies would generate under various financing scenarios. The Government contends that the sales illustrations show that the COLI policies were neither designed nor marketed from the perspective that the policyholders would pay premiums without loans and that the COLI policies do not make economic sense absent the policy loan interest deductions and resulting tax benefits. Without knowing the identities of the prospective clients for which the sales illustrations were prepared, the Government argues that it cannot ascertain (whether from the face of the documents or from further third-party discovery) the significance of the illustrations or understand the clients' possible business or tax motivations for evaluating the Mutual Benefit/Hartford COLI policies without policy loans. Moreover, the Government contends that the

client's identity is not privileged or beyond the scope of discovery and that the client's identity would be adequately protected by the confidentiality agreement that Newport and the Government have executed.

Newport responds that as an insurance broker it has a duty to maintain the confidentiality of its clients' and prospective clients' insurance needs. Moreover, the Government's need for the client's identity is far outweighed by the insurance customer's reasonable expectation that such private and sensitive information will not routinely be ordered disclosed. The Government views Newport's response as "disingenuous" because Campisi disclosed the names of certain Newport clients during his deposition without raising any confidentiality concerns. Accordingly, "[i]t is disingenuous for Newport to assert that the identities of its clients are confidential for purposes of certain discovery requests but not for others, and Newport should not be permitted to selectively withhold relevant information at its option." (Government's Reply Mem., doc. 25, p. 8.)

Camelot contends that neither the sales illustrations to third party clients nor the identities of these clients are relevant to the Government's claim that it was not entitled to deduct interest on its COLI policies. According to Camelot, the significance of the illustrations to named clients other than Camelot and these clients' possible business or tax motivations have no relevance to the determination of Camelot's business or tax motivations.

The Magistrate Judge concludes that the Government is entitled to the name and identifying information of the client who received the sales illustration from Newport for several reasons. First, Rule 26(b)(1) permits the Government to "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved" in this action, including "the identity and location of persons having knowledge of any discoverable matter." Fed.R.Civ.P. 26(b)(1). Newport concedes that the fact it provided sales illustrations to corporations considering the purchase of COLI policies is relevant to the issues in this action. Second, Newport does not claim that its client's name or its identify-

ing information is a trade secret or proprietary information. Rather, Newport argues that as an insurance broker it has a duty to maintain the confidentiality of its clients' identities and their insurance needs. This argument is weakened by the fact that Campisi apparently discussed the names of various Newport clients during his deposition without objection, and it is further weakened by the fact that Newport has not cited any case law supporting its argument or discussed any recognized testimonial privilege that would apply to this situation.

■ Newport has compared an insurance client's expectation of confidentiality to the expectations held by bank customers and accountants' clients. This comparison, however, does not lend support to Newport's argument because neither a banker-client privilege, *see Rosenblatt v. Northwest Airlines*, 54 F.R.D. 21, 22 (S.D.N.Y.1971); *United States v. Nelson*, 486 F.Supp. 464, 483 (W.D.Mich.1980); *see also King v. E.F. Hutton & Co.*, 117 F.R.D. 2, 8 (D.D.C.1987) (refusing to recognize stockbroker-client privilege), nor an accountant-client privilege exist under federal law. *See Couch v. United States*, 409 U.S. 322, 335, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973). Finally, the Magistrate Judge finds that the identity of Newport's client will be adequately protected from disclosure outside the context of this litigation by the confidentiality agreement that Newport and the Government have executed.

### III. Conclusion

For the reasons set forth above, the Government's May 10, 1999 motion to compel Newport to comply with the January 20, 1999 subpoena (doc. 2) and AEP's October 1, 1999 motion for leave to file a response to the Government's reply memorandum (doc. 26) are **GRANTED**. Newport is **ORDERED** to produce the documents responsive to Request No. 2 in unredacted form and to produce the documents requested in Request Nos. 6, 7, and 8 **within twenty-one (21) days of the date of this Order.**

Under the provisions of 28 U.S.C. § 636(b)(1)(A), Fed.R.Civ.P. 72(a), and Eastern Division Order No. 91–3, pt. F., 5, either

party may, within ten (10) days after this Order is filed, file and serve on the opposing party a motion for reconsideration by the District Judge. The motion must specifically designate the order, or part thereof, in question and the basis for any objection thereto. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.